Argued April 30, reversed and remanded May 17, 1973

ADAMS, *Appellant, v.* AMERICAN WESTERN
SECURITIES, INC. ET AL, *Defendants,*
JOACHIMS, *Respondent.*
510 P2d 838

*Frederick T. Smith,* Portland, argued the cause for appellant. On the briefs with him were Dusenbery, Martin, Bischoff & Templeton and John L. Langslet, Portland.

*Garr M. King,* Portland, argued the cause for respondent. With him on the brief were Kennedy & King, Portland.

Before O'CONNELL, Chief Justice, and McALLISTER, DENECKE*, HOLMAN, TONGUE, HOWELL and BRYSON, Justices.

TONGUE, J.

This is an action for recovery of the amount paid by plaintiff for the purchase of unregistered securities sold in violation of the Oregon Blue Sky Law, ORS 59.115. Judgments were entered against all defendants except defendant Bert E. Joachims. The trial court granted an order of involuntary nonsuit on the motion of that defendant. Plaintiff appeals from that order, after entry of a verdict and judgment for plaintiff against the remaining defendants.

The allegations of plaintiff's complaint under which he seeks judgment against defendant Joachims are as follows:

"Defendant, BERT E. JOACHIMS, participated or materially aided the defendants American Western Securities, Inc., Fred Stanley Parsons and Imperial Equities Corporation as their common attor-

---

* Denecke, J., did not participate in this decision.

ney by his advice and counsel, negligently given, including * * * drawing up a variety of documents used by defendants to effectuate the sale of the debentures to plaintiff * * *."

ORS 59.115 (1) and (2) provide that "any person who offers or sells a security" in violation of the Oregon Security Law (including ORS 59.055, requiring the registration of all nonexempt securities) is liable to the person buying the security from him, upon tender of the security, for the amount paid for the security, plus interest, attorney fees and costs.

ORS 59.115 (3) then provides as follows:

"* * * every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that he did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based. * * *"

The term "sale" is defined in ORS 59.015 (11) (a) as follows:

" 'Sale' or 'sell' includes every disposition or attempt to dispose of, contract to sell, attempt or offer to sell, exchange of, option for the sale of, solicitation of an offer to purchase, or subscription for, a security or an interest in a security for a consideration, directly or by an agent, circular, letter, advertisement or otherwise, regardless of whether or not any person so acting has power to pass title to or control the disposition of the security or acts as a finder. * * *"

■ The question to be decided in this case is whether defendant Joachims, who was the attorney for the remaining defendants and was also an officer and director of the corporate defendants, "participate[d] or

materially aid[ed]" in the sale to plaintiff of an unregistered security.

■ The determination of this question requires a review of the evidence in some detail, bearing in mind that because this case comes to us upon an appeal from an order granting a motion for an involuntary nonsuit, it is not for us to consider the credibility of witnesses or to resolve conflicts in the testimony. Instead, our function is to consider only whether there was substantial evidence from which, if believed by the jury, it could properly find that defendant "participate[d] or materially aid[ed]" such a sale so as to require that this case be submitted to the jury for decision. In that event, it would have been for the defendant to establish any affirmative defense that he may have, including the possible defense that he "did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based."

1. *Summary of evidence.*

Defendant Joachims was the personal attorney of defendant Parsons, the security salesman who sold the securities to plaintiff. He was also attorney for defendant American Western Securities, Inc. (American), an Oregon corporation licensed to sell securities and owned by Parsons as its principal stockholder, and attorney for defendant Imperial Equities Corporation (Imperial), another Oregon corporation owned by Parsons as its principal stockholder. Defendant Joachims was also an officer and director of American and Imperial. In addition, he performed legal services for Trails West, Inc., the corporation whose securities were the subject of the sale to plaintiff.

In May 1969, Trails West was in financial difficulty, with a "deficit figure" of $51,656.34 as of April 30, 1969, including some $25,000 for unpaid federal withholding taxes. Its president, Mr. Patterson, came in contact with defendant Parsons and discussed with him the possibility of raising needed funds by the sale of securities. In the course of these discussions defendant Joachims was also consulted and was furnished with statements showing its financial condition.

As the result of these consultations, a plan was developed in late May or early June 1969 under which Trails West would issue $100,000 in debentures, to be sold for it by Imperial, and 60 per cent of the outstanding Trails West common stock would be transferred to Imperial under a "management agreement."

There was evidence from which, if believed, a jury could have found that defendant Joachims was at least a participant in the formulation of this plan. There was no evidence that there was anything illegal at that time about that plan or its contemplated manner of execution.

There was evidence, however, from which a jury could have found that without waiting for the documents to be prepared, as required to make this plan effective, including any required registration of the debentures to be issued and sold under this plan, defendant Parsons proceeded in late May or early June to solicit plaintiff and four other persons to buy these debentures and secured commitments for the purchase of all of them, at a purchase price of $100,000.

There was testimony that in late May or early June 1969, plaintiff who knew that the securities were "speculative," not only agreed to pay $25,000 for such debentures, but delivered to Parsons his check, dated

June 11, 1969, payable to American for $20,500 in part payment for that purchase with the balance of $4,500 payable from the proceeds of the sale by American of other securities owned by plaintiff and held by American.

The debentures, however, were not delivered at that time because they were not yet in existence and plaintiff did not receive "anything in writing" at that time to confirm the transaction. Also, these debentures had not yet been registered with the Oregon Corporation Commission. Neither had notice been filed with the Corporation Commission, as required by ORS 59.035 (12) (a), to come within the exemption from registration for sales of stock to not more than 10 persons.

There was no evidence that defendant Joachims participated in that transaction between Parsons and plaintiff or that plaintiff had met Joachims at that time. Defendant Joachims also denied that he had any knowledge of this sale to plaintiff at that time or until some weeks later. Defendant Parsons testified, however, that he was "almost certain" that when he was "talking" to plaintiff and the four other "investors" about "putting their money into Trails West" Mr. Joachims knew that he was "talking to those people," but Parsons "could not swear to it that he did." Parsons also testified that he knew that the debentures sold by him to plaintiff had not been registered, but that he sold them without registration upon the advice of Mr. Joachims. He also testified, however, that he knew that he could not "confirm a sale until we had a prospectus."

On June 5, 1969, Mr. Joachims wrote a letter to Trails West outlining a "preliminary agreement" be-

tween the parties, subject to being "refined by formal agreement" and stating that "all appropriate provisions of state and federal law are to be complied with." That letter also stated that upon its approval by Trails West it would be considered to be an "option agreement" in favor of Imperial until June 17, 1969, and that "Mr. Parsons has indicated that Imperial Equities Corp. may direct within the next several days, $100,000 in risk capital in Trails West." Plaintiff also contends that the jury could find from that statement that Mr. Joachims must have known at that time that Parsons was at least engaged in the solicitation of prospective purchasers for the proposed bonds, if not actually successful in the sale of at least some of such bonds.

At about that same time, Mr. Joachims prepared a proposal form letter which, by its terms, appeared to be a letter to be delivered to purchasers of the bonds advising them of various facts, including the fact that Trails West was in financial difficulty; that Imperial had an option to acquire a controlling interest in Trails West and that this agreement was available for inspection, together with Trails West financial statements. That letter also stated the purposes for which the money paid by the purchasers of the indemnities would be used and made it clear that the completion of the agency agreement would require formal approval by the boards of Trails West and Imperial.

According to Mr. Joachims, the purpose of that letter was that it be filed with the Oregon Corporation Commissioner as a "sample of a proposal that would be made to various people," as a part of a plan that would permit either registration of the securities or their sale without registration under the exemption for sales of securities to not more than 10 persons;

provided that five days' notice was first given to the Commissioner. (See ORS 59.035 (12) (a)). Mr. Joachims admitted that he knew at that time that there was a "question" whether these securities would have to be registered.

Mr. Joachims and Mr. Parsons then made a trip to Salem to meet with the Corporation Commissioner and left the proposed letter with him. After that meeting Mr. Joachims decided not to "try the exemption route," but to "file a formal registration statement, which required a prospectus to be delivered to the prospective investors." According to Mr. Joachims, it was "determined" at about that time not to use the proposed letter to purchasers of the debentures.

The next date of significance is June 12, 1969, on which a meeting was held at which the following documents, as prepared by Mr. Joachims, were executed:

(1) A "Management Agreement," under which it was provided, among other things, that Trails West would issue $150,000 in "convertible subordinated debentures," to be sold for it by Imperial and that "upon Imperial causing $100,000 to be raised on placement of $100,000 of said * * * debentures, Imperial will be issued 60,000 shares" or 60 per cent of the outstanding Trails West common stock;

(2) Restated Articles of Incorporation for Trails West, to authorize issuance of the debentures;

(3) Minutes of a special joint meeting of directors and stockholders of Trails West adopting these "Articles" and approving the "Management Agreement."

According to Mr. Patterson, president of Trails West, "it was directly said" at that meeting, in the presence of Mr. Joachims, "that there was debentures

sold. It was stated that the money had been raised —a portion of the money had been raised, and that the balance of it was shortcoming [sic]." Mr. Joachims, however, denied any such knowledge as of the date of that meeting.

However, it appears from the checkbook of American that the next day, Friday, June 13, 1969, a check for $50,000 was issued to the Trails West Trust fund, including the $25,000 as previously paid by plaintiff by check dated June 11, 1969, and that on June 18, 1969, two additional checks were issued totaling $50,000, representing the entire $100,000 in proceeds from the previous solicitations by Mr. Parsons for the sale of these yet unissued debentures. A check to the printers for the printing of the debentures, also dated June 13, 1969, was issued by Mr. Joachims, who had "control" of the Imperial checkbook and "wrote out all the checks."

On that same day, June 13, 1969, according to Mr. Joachims, he made a second trip to the office of the Oregon Corporation Commissioner, where he filed a "Registration Statement," attaching a prospectus for the debentures to which a copy of the "Management Agreement" was to be attached, and also financial statements of Trails West.

However, that Registration Statement was not stamped as "received" by the office of the Corporation Commissioner on Friday, June 13, but was stamped as "received" on the following Monday, June 16, 1969. It appears that on that date Mr. Joachims was directed to submit a new "cover page" for the prospectus, which he transmitted by letter bearing that date and stating that "[n]o more than ten investments *will be placed* and only after the investors have been given a complete Prospectus." (Emphasis added.)

On the same day, June 16, 1969, an order was entered by the Corporation Commission approving the sale of the debentures in accordance with the conditions as set forth in that order, including a requirement that a copy of the prospectus as approved by the Commissioner "shall be sent or given to each person to whom such securities are offered or sold."

Mr. Parsons testified that he mailed a copy of the prospectus to plaintiff. The trial court sustained an objection to a question whether that was not done until the week of June 17, but the jury could infer that it was not mailed until after plaintiff had already agreed to buy the debentures and had paid for them and also after the prospectus was approved on June 16.

It also appears that at some unspecified date a copy of the letter previously prepared by Mr. Joachims as a proposed form letter to purchasers of the debentures, and bearing his signature, was also signed by plaintiff to indicate his acceptance of its terms. Parsons testified that Mr. Joachims either himself mailed those letters to purchasers of the debentures or asked him to get their signatures on such letters. Mr. Joachims testified that even then he did not know that securities had already been sold prior to their registration; that after the decision to register the securities he did not intend to use that letter and that he did not send it out.

Plaintiff testified that the debentures were delivered to him at the same time that he received that letter and that this was "a long time afterwards."

The entire $100,000 from the sale of the debentures was used by Trails West to pay various debts. No commissions were paid for sale of the debentures.

Mr. Joachims was paid $850 by Imperial for his legal services in this transaction.

After the sale of the debentures plaintiff, Mr. Parsons and Mr. Joachims became members of the Trails West board of directors. Plaintiff attended one board meeting. In late December 1969, or early January 1970, that corporation went bankrupt. Plaintiff still held the debentures at the time of trial and had never received any part of his money back.

2. *There was sufficient evidence from which the jury could have properly found that defendant Joachims "participated or materially aided" in the sale.*

We have previously held that the Oregon Blue Sky Law, including ORS 59.115, is to be "liberally construed to afford the greatest possible protection to the public." *Adamson v. Lang,* 236 Or 511, 516, 389 P2d 39 (1964); *Spears v. Lawrence Sec., Inc.,* 239 Or 583, 587, 399 P2d 348 (1965), and *Gonia v. E. I. Hagen Co.,* 251 Or 1, 3, 443 P2d 634 (1968).

In *Adamson* we also held (at 515) that the making of a loan by a defendant for the purpose of lifting a sales restriction imposed by the Corporation Commissioner would support a jury verdict based upon "participation" by such a defendant in a scheme designed to make possible the sale of a security and, as such, constituted a "participation" or an "aiding and abetting" in the sale of the stock, under what was then ORS 59.250.

In *Spears* we held (at 586) that persons who were the officers, directors and stockholders of Lawrence Securities, Inc., and who supplied the brochure and sales letter in the sale of securities to plaintiff and the advertisement which prompted his original

inquiry, thereby "participated" or "aided" in the sale of a security within the meaning of the same statute.

More recently, but still under former ORS 59.250, we held in *Gonia* (at 7) that a defendant who accompanied a securities salesman in contacting as prospective purchasers persons who knew him or his reputation and had confidence in him, was "liable" under the statute if he only "aided another in making the sale."

However, in *Gonia v. Estep,* 251 Or 431, 446 P2d 114 (1968), we affirmed the sustaining of a demurrer to a complaint which alleged that an attorney had "aided, abetted and participated" in the sale of securities by acts which (at 433) we held to consist "* * * solely of the preparation of documents and other services normally performed by a lawyer for his client * * *," where it was "* * * apparent that plaintiffs were not attempting to allege that defendant had knowledge of the violation of the Blue Sky Law" as was then required of such a person. (See *Spears v. Lawrence Sec., Inc., supra.*)

In *Gonia v. Estep* we also pointed out (at 433), that:

> "* * * Although the term 'aid and abet' in some context might convey the thought that the abettor had knowledge of the unlawful scheme being perpetrated, the complaint in the present case does not purport to use the term as signifying defendants' connivance with others in the unlawful sale of securities. * * *"

Plaintiff has also cited *Black & Company v. Nova-Tech, Inc.,* 333 F Supp 468 (D Or 1971), in which Judge Goodwin, a former member of this court, considered an action under the present ORS 59.115 (3), under which, as the result of a 1967 amendment, a person

need not have actual knowledge of an illegal securities transaction to become a "participant" in such a sale. In denying defendant's motion to dismiss for want of jurisdiction over defendants who were attorneys in California, he said (at 472) that:

"* * * a person may be a 'participant' in an illegal securities transaction without having communicated with the purchaser. *Adamson v. Lang, supra.*

"It is not disputed that defendant Barton of the Nossaman firm prepared the legal papers necessary for Nova-Tech to complete the sale of its securities. Even if Barton did not know and could not have known of Nova-Tech's failure to register the securities, he was a participant in the sale because, without his assistance, the sale would not have been accomplished. Adamson v. Lang, *supra.*"

In addition, plaintiff has cited *Blakely et al v. Lisac et al,* 357 F Supp 255 (D Or 28, 1972), in which, in an action under Section 10 (b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j (b), a defendant who was the attorney who prepared the prospectus and other documents used in the illegal sale was held liable (at 18-19), upon the ground that:

"* * * [h]e was experienced in the securities field and had handled numerous public offerings.

"An attorney cannot escape liability for fraud 'by closing his eyes to what he saw and could readily understand.' *SEC v. Frank,* 388 F.2d 486, 489 (2d Cir. 1968). Both as an attorney and as a director, Gygi knew or should have known of the misleading financial information in the prospectus which he should have investigated. Here, Gygi's role was 'beyond a lawyer's normal one,' and he is held to even a higher standard of care. *SEC v. Frank,* supra, at 489."

In this case defendant Joachims says that the

issue under plaintiff's complaint is whether plaintiff presented any evidence that Mr. Joachims participated in the sale by "drawing documents used by [other] defendants to effectuate the sale." On that issue defendant Joachims contends that his acts "consisted solely of preparation of documents and other services normally performed by a lawyer for his client." He also contends that "none of the documents prepared by Mr. Joachims were used to promote the sale of the security," but "were all prepared after the sale took place"; that "none of the documents prepared by Mr. Joachims even came to the attention of the plaintiff until some time after the sale," and that "plaintiff is stretching the imagination by arguing that Mr. Joachims participated in the illegal sale of an unregistered security by preparing documents for the registration of the security."

In support of these contentions defendant Joachims cites cases in support of the proposition that "a corporate attorney must do more than prepare legal documents and tend to their preparation" to be held liable under such a statute, citing *Hughes v. Bie,* 183 So 2d 281 (Fla D Ct App 1966); *Nicewarner v. Bleavins,* 244 F Supp 261 (D Colo 1965); and *Rosenberg v. Glove Aircraft Corporation,* 80 F Supp 123 (ED Pa 1948).

On the other hand, in *Black & Company v. Nova-Tech, Inc., supra,* Judge Goodwin appeared to hold that mere preparation by an attorney of legal papers necessary to complete the sale of a security may constitute "participation" in such a sale within the meaning of ORS 59.115 (3).

The decisions in *Black & Company v. Nova-Tech, Inc., supra,* and *Blakely et al v. Lisac et al, supra,* are

not binding on us and some of the statements in those opinions may be overly broad, if literally applied. In this case, however, we find that there was evidence which, if believed by the jury, would have supported a finding by it that defendant Joachims did considerably "more" than merely to "prepare legal documents and tend to their execution" and to perform "other services normally performed by a lawyer for his client." Thus, there was evidence from which the jury could have found that Mr. Joachims, as an attorney participated in a plan or scheme under which Mr. Parsons was to solicit purchasers so as to raise $100,000 in payments by them for securities which were not yet issued, much less registered. See also *Escott v. Barchris Construction Corporation,* 283 F Supp 643 (SDNY 1968) and *Gonia v. Estep, supra* at 433.

In addition, and even if it be held that there was no evidence that defendant Joachims participated in any "illegal scheme" or that he did "more" than to prepare the legal documents required for registration of a security and attend to their execution, there was evidence from which the jury could find in this case that at the meeting on June 12, 1969, he knew that Mr. Parsons had already solicited prospective purchasers and that at least a portion of the needed $100,000 had already been raised, and that Mr. Joachims nevertheless personally delivered and filed these documents with the Oregon Corporation Commissioner, knowing at the time that no sale could legally be made until after such registration was approved.

■ Plaintiff need no longer prove the element of knowledge under ORS 59.115 (3) in order for one who "participates or materially aids" in the sale of an unregistered security to be held liable to the purchaser of such a security, lack of knowledge now being an

affirmative defense to be established by the defendant. Nevertheless, we hold that when an attorney prepares, attends to the execution of, and personally delivers and files documents required for the registration of a security with the knowledge that solicitation and sales of such a security have already been made, such conduct goes beyond what plaintiff describes as the "preparation of documents and other services normally performed by a lawyer for a client" so as to constitute "participat[ion]" or "materially aid[ing]" in the sale of such a security. Indeed, in *Gonia v. Estep, supra,* we pointed out that "* * * the term 'aid and abet' in some context might convey the thought that the abettor had knowledge of [an] unlawful scheme being perpetrated. * * *"

Finally, we come to defendant Joachims' contention that he could not have "participate[d] or materially aid[ed]" in the sale of an unregistered security because all of the documents prepared by him were prepared after the sale had already taken place.

It is true that the "sale" of an unregistered security had been made previously to plaintiff in the sense of the "solicitation of an offer to purchase," which is included in the definition of a "sale" for the purposes of the Oregon Blue Sky Law [ORS 59.015 (11) (a)]. As such, there was an illegal "sale" of an unregistered security to plaintiff prior to the preparation of documents by defendant Joachims.

Nevertheless, that sale would and could not have been completed or consummated without the preparation by Mr. Joachims of the "Management Agreement," the "Restated Articles of Corporation" authorizing issuance of the debentures, the minutes of the meeting approving the "management agreement" and the "re-

stated articles," and the printing of the debentures, for which payment was made by him by the issuance of an Imperial check.

Because these things, which were also done prior to the registration of the security, contributed to the completion and consummation of the sale of the debentures to plaintiff and because of the active participation in all of these things by Mr. Joachims, we hold that there was evidence from which the jury could find that he thereby "participate[d] or materially aid[ed]" in the illegal sale of an unregistered security, within the intended meaning of ORS 59.015.

If the law were otherwise, any lawyer or anyone else who, with full knowledge of the unlawful "solicitation of an offer to purchase" an unissued and unregistered security, proceeds to make the further arrangements necessary for issuance and delivery of such a security, would have a complete defense, regardless of whether the security was ever subsequently registered. Surely, such an absurd result was not intended by the legislature in the adoption of this statute. On the contrary, and as previously held by this court, we believe that the Oregon Blue Sky Law was intended to be "liberally construed to afford the greatest possible protection to the public."

For all of these reasons, we hold that the trial court erred in sustaining the motion of defendant Joachims for an involuntary nonsuit.

In so holding we wish to state again that we do not undertake to pass upon the credibility of the various witnesses. It may be that a jury will believe the testimony of defendant Joachims, including his testimony that he did not know and had no reason to know of the prior sales by Mr. Parsons. We hold,

however, that under the terms of ORS 59.115 (3) these matters, among others, were matters of defense which defendant Joachims had the burden to prove and that plaintiff was entitled to have his case against defendant Joachims submitted to the jury.

Reversed and remanded.