Argued and submitted July 13, 1993, reversed and remanded June 22, 1994

## James R. TOWERY,
*Appellant,*

*v.*

## John Patrick LUCAS,
Personal Representative of
the Estate of John R. Lucas,
*Defendant,*

*and*

## John A. DiLORENZO, Jr.
and O'Connell, Goyak & DiLorenzo, P.C.,
*Respondents.*

(9105-02865; CA A75481)

876 P2d 814

Mark A. Turner argued the cause for appellant. With him on the briefs was Ater Wynne Hewitt Dodson & Skerritt.

Joseph C. Arellano argued the cause for respondents. With him on the brief was Kennedy, King & Zimmer.

Before Warren, Presiding Judge, and Edmonds and Landau, Judges.

LANDAU, J.

**LANDAU, J.**

Plaintiff appeals from a summary judgment in favor of defendants in this action for securities laws violations.[1] We reverse and remand.

We view the facts from the record on summary judgment in the light most favorable to the nonmoving party. *Gaston v. Parsons*, 318 Or 247, 251, 864 P2d 1319 (1994).

John Lucas, Stephen Lindell and plaintiff each owned a one-third interest in a parcel of property, known as the "Stayton property," on which they intended to build a shopping mall. Robert Freres and the Freres Foundation (Freres) held the first mortgage on the property.

In 1987, Lucas, Lindell and plaintiff agreed to form a corporation, Santiam Valley Mall Properties, Inc. (SVMP), to facilitate their development plans. Lindell and plaintiff then transferred their interests in the Stayton property to Lucas, who, in turn, agreed to transfer the property to SVMP. The parties were to become the shareholders of SVMP. However, no shares were issued. Lucas, meanwhile, used the Stayton property as security for a $120,000 personal loan from Jeanette Petix. Although Lucas told neither Lindell nor plaintiff about the Petix mortgage, he did record it.

During that time, payments on the Freres mortgage apparently were not being made. Sometime in 1987, Freres initiated a foreclosure proceeding. Freres ultimately obtained a judgment of foreclosure. However, the parties later settled and, in an agreement dated August 1, 1989, the owners agreed to pay Freres $210,000 in three installments due by the end of that year.

Lucas died. A dispute then arose between the Lucas estate, Lindell and plaintiff concerning the property. That dispute, too, was settled. Defendants, John DiLorenzo and his law firm, represented the Lucas estate throughout the settlement negotiations. During the negotiations, plaintiff asked whether there were any other encumbrances on the Stayton property. Neither the personal representative of the Lucas

---

[1] Plaintiff settled his claims against defendant John Patrick Lucas, personal representative of the estate of John Lucas. Only defendants John DiLorenzo, Jr., and O'Connell, Goyak & DiLorenzo, P.C., are parties to this appeal.

estate nor defendant DiLorenzo disclosed the existence of the Petix mortgage, although the personal representative knew of it.

DiLorenzo drafted the settlement agreement, which was executed August 31, 1989. In section 1 of the agreement, Lindell agreed to abandon any right to the property in exchange for release of any claims against him.

Section 2 of the settlement agreement provided:

"2.   *Formation of Santiam Valley Mall Properties, Inc.*

"[Plaintiff] and the Estate agree to organize, pursuant to the laws of the State of Oregon, the Corporation. [Plaintiff] and the Estate will be the sole shareholders of the Corporation. The Estate will be issued one-half (1/2) of the capital stock of the Corporation and [plaintiff] will be issued one-half (1/2) of the capital stock of the Corporation."

In sections 3 and 4 of the settlement agreement, plaintiff agreed to make the first two payments, of $20,000 and $30,000 respectively, required under the stipulation with Freres, and to arrange and personally guarantee a loan to SVMP that would cover the balance of the payment to Freres and $20,000 in legal fees.

The settlement agreement acknowledged that plaintiff had already paid at least $20,000 to Freres under the stipulation. The settlement agreement provided that the payment of the additional $30,000 was a condition precedent to the issuance of the SVMP stock and that, if the loan could not be arranged by December 1, 1989, the agreement would be of "no further force or effect."

Plaintiff paid the additional $30,000 to Freres and attempted to arrange the loan. Plaintiff then negotiated, for $10,000, an extension on the December 1, 1989, deadline and found someone to loan the money. The lender requested a title report. When that title report, dated December 5, 1989, revealed the existence of the Petix mortgage, the loan fell through. Consequently, so did the settlement agreement. Plaintiff lost his $50,000 and was never issued any stock in SVMP.

Plaintiff then brought this action against defendants for securities fraud under ORS 59.115(1)(b), which imposes liability on a person who

"[s]ells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the untruth or omission."

The statute further provides that

"every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known of the existence of the facts on which liability is based * * *." ORS 59.115(3).

■ Plaintiff alleged that the settlement agreement constituted a sale of SVMP stock, that the sale occurred by means of the Lucas estate's failure to disclose the existence of the Petix mortgage against the Stayton property, and that defendants participated in or materially aided the sale by also failing to disclose the existence of the encumbrance. Defendants moved for summary judgment, which the trial court granted.

On appeal, plaintiff assigns error to the trial court's decision to grant the summary judgment motion. Summary judgment is appropriate when no issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Gaston v. Parsons, supra,* 318 Or at 251.

Defendants argue that they are not liable under ORS 59.115 as a matter of law, because the settlement agreement did not constitute a "sale" of securities. They rely on a number of theories in support of that argument.

First, defendants argue that there was no "sale" of securities because both parties agreed to organize the SVMP corporation and both parties agreed that each would become 50 percent shareholders in the new corporation. Defendants cite no authority for their argument that an agreement by which parties undertake to form a corporation and issue themselves shares of stock is not a "sale" of securities within the meaning of the securities statute, and we are aware of none.

■ Whether a "sale" of securities within the meaning of the statute includes a transaction in which the parties agree to apportion the shares of a newly formed corporation is a question of legislative intent. ORS 174.020; *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We begin with the text and context of the statute. *Sanders v. Oregon Pacific States Ins. Co.*, 314 Or 521, 527, 840 P2d 87 (1992). The statute defines "sale" broadly, including

"every contract of sale of, contract to sell, or disposition of, a security or interest in a security for value." ORS 59.015-(15)(a).

In this case, the settlement agreement is a contract that expressly concerns the "disposition of" stock in SVMP. Stock is a "security or interest in a security." ORS 59.015(17)(a). On its face, the settlement agreement falls within the statutory definition of a "sale" of securities.

That reading of the statute is consistent with a long history of case law in this state recognizing that the securities statutes apply to as yet unorganized businesses. In *State v. Whitaker et al.*, 118 Or 656, 661, 247 P 1077 (1926), the Supreme Court said:

"The statute is designed for the protection of the public. There is more reason for the application of this law to unorganized business concerns than to those having a recognized legal entity."

It also is consistent with case law in other jurisdictions, construing the federal counterpart to Oregon's securities statute. In *Stevens v. Vowell*, 343 F2d 374 (10th Cir 1965), for example, the plaintiff and the defendants entered into an "Agreement to Form a Corporation." The agreement provided that the plaintiff was to be issued shares in the new corporation, for which he paid $20,000. He paid the money on the basis of representations the defendant made to him about the need for the money and the uses to which it would be put. When the defendant did not deliver the shares, the plaintiff sued. The defendant argued that it was not liable under the federal securities laws, because the agreement did not constitute a "sale" of securities. The court held:

"The 'Agreement to Form a Corporation,' whether it be considered an investment contract, a contract for the distribution of shares of corporate stock or a joint venture agreement,

expressly provides for a corporation to be thereafter formed. As such it is most certainly a contract to buy, purchase or otherwise acquire those shares of stock. And, it most assuredly comes within the definition of security as a preorganization certificate or subscription and an investment contract as well as being a certificate of interest or participation in or right to subscribe to or purchase stock." 343 F2d at 379.

*See also Unit, Inc. v. Kentucky Fried Chicken Corporation*, 304 A2d 320 (Del Super 1973), *overruled on other grounds Mann v. Oppenheimer & Co.*, 517 A2d 1056 (Del Super 1986).

Second, defendants contend that, even if the settlement agreement involves the "disposition of" securities, it still does not constitute a "sale" of securities within the meaning of ORS 59.015(15)(a), because the agreement does not provide for a disposition of securities "for value." According to defendants, the necessary element of "value" is lacking, because nothing in the agreement requires plaintiff to pay for his stock. Defendants acknowledge that sections 3 and 4 require plaintiff to pay $50,000 to Freres. They nevertheless argue that that payment does not constitute anything of "value" for the purposes of a sale of SVMP stock, because plaintiff already was obligated to pay that money to Freres under the terms of the earlier settlement with Freres.

The $50,000 in payments to Freres, however, were not the only things of "value" that the settlement agreement required in exchange for the SVMP stock. Among other things, the agreement required plaintiff to obtain and personally guarantee a large loan to cover the balance of the money that the Lucas estate and Lindell, along with plaintiff, had previously agreed to pay Freres, after the initial payments totalling $50,000 had been paid.

Defendants argue that even those additional obligations cannot satisfy the statutory "value" element of a sale of securities, because plaintiff agreed to undertake those obligations in consideration for the settlement of his dispute with the Lucas estate and Lindell, not in consideration for the issuance of SVMP stock. The agreement, however, explicitly characterizes plaintiff's fulfillment of those obligations as a prerequisite to the issuance of the stock. At the very least, there is a dispute as to the meaning of ambiguous contractual terms, which presents a factual issue not properly resolved on

summary judgment. *Biomass One, L.P. v. S-P Construction (A68622)*, 120 Or App 194, 200, 852 P2d 847 (1993).

Third, defendants argue that there was no "sale" of securities as a matter of law, because the settlement agreement constituted a mere "offer" to sell securities, which is no longer subject to the anti-fraud provisions of ORS 59.115. Although defendants correctly observe that Oregon Laws 1985, chapter 349, section 13, amended the statute to exclude from its coverage mere offers to sell securities, they incorrectly conclude that the settlement agreement constitutes a mere offer. Defendants ignore the fact that the agreement is a contract that expressly disposes of securities for value and, therefore, falls within the statutory definition of a "sale" of securities. ORS 59.015(15)(a). Defendants further ignore the undisputed fact that, on its face, the settlement agreement reflects more than an offer; it reflects an offer, which was accepted, memorialized in a written agreement and executed both by plaintiff and by the Lucas estate, whom defendants represented in the transaction.

Defendants next argue that they are not liable under ORS 59.115, because their representations or omissions concerning the existence of the Petix mortgage were not material as a matter of law. Defendants assert that Petix's mortgage interest was not an interest in real property that affected the title to the Stayton property, but rather was a security interest in a joint venture, which they characterize as an interest in personal property.

An omission or representation is immaterial as a matter of law "only when reasonable persons could not differ as to the importance of the omissions or representations." *Everts v. Holtmann*, 64 Or App 145, 153, 667 P2d 1028, *rev den* 296 Or 120 (1983). In this case, whether the Petix mortgage is characterized as an interest in realty or personalty, there is evidence in the summary judgment record that both plaintiff and the prospective lender considered its existence to be material, and it can reasonably be inferred from that evidence that the deal fell through because of the prospective lender's discovery of the mortgage. Given that record and the inferences that reasonably may be drawn from it, we cannot say that, as a matter of law, the Petix mortgage was not material.

Defendants alternatively argue that the Petix mortgage was not material as a matter of law, because plaintiff did not discover its existence until four days after December 1, 1989, the deadline for arranging the loan to the corporation. According to defendants, the settlement agreement had expired by the time the title report disclosed the existence of the encumbrance, on December 5, 1989. Plaintiff, however, testified that he had obtained an extension of the December 1, 1989, deadline and paid $10,000 for it. Defendants contend that the extension was never memorialized in an executed, written agreement. Defendants miss the point. There is at least a genuine dispute as to whether an extension was, in fact, obtained. Thus, defendants cannot demonstrate that the discovery of the Petix mortgage after December 1, 1989, rendered its disclosure immaterial as a matter of law.

Defendants next argue that the failure to disclose the existence of the Petix mortgage was not material because the mortgage had been recorded earlier and that recording constituted constructive notice of its existence, as a matter of law. In support of their argument, defendants rely on Oregon's recording statute, which provides that recording of an interest in real property "constitutes notice to third persons of the rights of the parties under the instrument * * *." ORS 93.710(1). In essence, defendants argue that the quoted portion of the recording statute implicitly imposes a burden of inquiry on plaintiffs bringing an action under the securities statute. The language of the securities statute does not support that argument.

ORS 59.115(1)(b) provides that a seller of securities may be liable for selling by means of an untrue statement or omission of material fact, "the buyer not knowing of the untruth or omission." The statute says nothing about a buyer's obligation of inquiry. In contrast, ORS 59.115(1)(b) further provides that a seller may avoid liability for selling a security by means of an untrue statement or omission if the seller "did not know, *and in the exercise of reasonable care, could not have known*, the untruth or omission." (Emphasis supplied.) Thus, when the legislature intended to impose an obligation of inquiry, it plainly said so. ORS 59.115(1)(b) imposes an obligation of inquiry on defendants who seek to avoid liability for their untrue statements. The statute

imposes no such obligation in buyers who were induced to purchase securities on the basis of those untruths. The fact that the Petix mortgage was recorded, therefore, did not make its existence immaterial as a matter of law.

5.     Defendants' final argument is that they cannot be held liable under ORS 59.115 as a matter of law, because the statements or omissions that form the basis for plaintiff's claim were made by defendants in their capacities as attorneys for the Lucas estate, and those statements are, accordingly, "privileged." Defendants rely on our decision in *Tipton v. Willamette Subscription Television*, 85 Or App 79, 735 P2d 1250, *rev den* 304 Or 240 (1987). That case, however, concerned the extent to which statements of the defendant's attorney could provide the basis for the plaintiff's claim under a common law theory of negligent misrepresentation. This is a statutory claim brought under ORS 59.115(3), which establishes liability of "*every person* who participates or materially aids in the sale" of securities by means of an untrue statement or omission. (Emphasis supplied.) "Every person," as used in that statute, includes attorneys, and no privilege for statements of attorneys who participate or materially aid in an unlawful sale of securities has been recognized by the courts. *See, e.g., Prince v. Brydon*, 307 Or 146, 150-51, 764 P2d 1370 (1988); *Adams v. American Western Securities*, 265 Or 514, 529, 510 P2d 838 (1973).

Defendants have failed to demonstrate that there are no genuine disputes as to issues of material fact or that they are entitled to judgment as a matter of law. The trial court, therefore, erred in granting them summary judgment.

Reversed and remanded.