Argued and submitted January 26, affirmed November 30, 1983, reconsideration denied January 27, petition for review denied April 3, 1984 (296 Or 712)

JOST et al,
*Appellants,*

*v.*

LOCKE et al,
*Respondents.*

(A7908 03943; CA A23777)

673 P2d 545

Stuart M. Brown, Portland, argued the cause and filed the briefs for appellants. With him on the briefs was Tonkon, Torp, Galen, Marmaduke & Booth, Portland.

Roscoe C. Nelson, Jr., Portland, argued the cause and filed the brief for respondents. With him on the brief was Nelson & Nelson, Portland.

Before Gillette, Presiding Judge, and Warden and Young, Judges.

GILLETTE, P. J.

## GILLETTE, P. J.

Plaintiffs appeal the trial court's summary judgment for defendants Locke (defendants)[1] following the parties' cross-motions for summary judgment on each count of plaintiffs' second amended complaint seeking damages for the value of gold coins sold by defendants' company but never delivered. We affirm.

This action arose out of business transactions between plaintiffs and defendants' company during the years 1974 through 1978. During that time, defendants were officers of Columbia Coin, Inc. (Columbia Coin), an Oregon corporation involved in buying and selling coins. Columbia Coin did business in Oregon, in other states and in Canada. From 1972 until January, 1979, defendant Ladum served as a "trader" for Columbia Coin. As a trader, he was responsible for "covering" demand sales to customers with purchases by Columbia Coin.[2]

Each of the individual plaintiffs purchased gold or silver coins from Columbia Coin sometime between 1974 and 1978. Columbia Coin's policy was to issue a demand receipt for the coins; the coins were turned over to the customer within 48 hours after demand. In late 1978, Ladum, through unsuccessful speculative trading, rendered Columbia Coin insolvent. On December 8, 1978, it was placed in receivership. It later filed a voluntary petition under Chapter XI of the Bankruptcy Act and the trustee made partial payments to its creditors, including plaintiffs. The present action was then filed.

Plaintiffs' complaint, briefly summarized, alleges: (1) unregistered sales of Oregon securties; (2) fraud in the sale of securities, under Oregon securities (Blue Sky) laws; (3) unregistered sales of securities and fraud in violation of the federal Securities Act of 1933; (4) fraud; and (5) conversion. The parties filed cross-motions for summary judgment as to each of plaintiffs' claims. Defendants' motions were granted. This appeal followed.

The following facts are undisputed:

---

[1] A partial order of dismissal was entered with rjespet to plaintiffs Warnick and Bailey. Co-defendant Ladum is not involved in this appeal.

[2] A trader "covers" demand sales by purchasing "positions," which are promises of future delivery of gold or silver coins from suppliers.

## 1. *PATRICIA JOST*

Jost paid $2,662 to Columbia Coin on January 14, 1974, for the purchase of a bag of $1,000 face value 1964 Kennedy one-half dollars. The purchase was not solicited by Columbia Coin; Jost learned about Columbia Coin from a colleague who had made silver purchases in the past. She looked to the market to realize any profit, not to the efforts of Columbia Coin. Jost placed her order over the telephone. She inquired about storage and was told that Columbia Coin would store the silver for $7 per year. A specific bag of silver was purchased for her, labeled with her name, and stored on Columbia Coin's premises.

In early November, 1978, Norman Locke noticed that the Jost silver bag was missing. The reason for the disappearance was never discovered. On December 18, 1978, after Columbia Coin was placed in receivership, Jost requested delivery of her silver. Failing to receive delivery, she filed a claim with the bankruptcy court and eventually received $1,361.54.

## 2. *MARDAN MANAGEMENT, LTD.*

T. J. Robinson and his wife are the sole stockholders of Mardan Management. Robinson learned about Columbia Coin from Lee, a coin dealer in Vancouver, B.C., who had no affiliation with Columbia Coin.

Robinson first communicated with Columbia on May 8, 1978, when he sent it a check for $20,000, with a letter requesting the purchase of 100 Krugerands. Robinson made the purchase based on Lee's advice. Robinson's letter requested that the coins be stored at the Canadian Imperial Bank of Commerce in Portland, but they were not. Instead, Ladum's secretary acknowledged Robinson's purchase by letter, stating that 100 Krugerands were being stored on Mardan Management's behalf at Columbia Coin. Columbia Coin never requested a storage fee from Robinson.

Robinson expected to be able to pick up his coins on demand. He also expected to make his own decisions about resale and relied on the market for any profit. He made no demand on Columbia Coin before the initiation of the bankruptcy proceedings. Mardan Management filed a claim in that proceeding and received $6,224.33.

### 3. *HOWARD ANDERSON*

On November 8, 1978, Anderson paid $4,640 to Columbia Coin for the purchase of 20 gold Krugerands. He paid an additional $7.50 as a storage fee. Anderson learned about Columbia Coin from a friend. He contacted Columbia Coin by telephone and arranged the purchase. He understood that he could have possession of the coins on demand and that any profit he might make would depend upon the market and not on the efforts of Columbia Coin. After being notified of the bankruptcy proceeding, Anderson filed a claim for the value of his coins and received $1,267.66.

### 4. *DAVID THOMPSON*

On December 4, 1978, Columbia Coin received $10,400 for the purchase of 50 gold Krugerands from Thompson, who was acting on behalf of a bank as trustee for Steven Bates. Thompson discussed the purchase by telephone with Kwan, an employe of Columbia Coin. Kwan advised Thompson that Columbia Coin did not have the Krugerands on hand but would purchase them at a quoted price if he would forward the money. Thompson arranged to come to Portland to pick up the coins in mid-December, 1978, but Columbia Coin was placed in receivership before Thompson attempted to take possession of them. He filed a claim in the bankruptcy proceeding as trustee for Bates and received $2,682.46.

Although the evidence shows that a specific bag of coins was purchased for Jost, tagged with her name and stored at Columbia Coin, there is no evidence to show that the other plaintiffs' coins were segregated, identified or even obtained. Apparently, Columbia Coin's policy with regard to fungible coins was to purchase coins to "cover" the receipt when the owner requested delivery. The company never had adequate supplies of coins on hand to meet the demands of all those holding receipts. This policy was not explained to purchasers, who believed that specific coins were segregated and stored for them by Columbia Coin. The funds paid by plaintiffs to purchase the coins, other than Jost's purchase, went directly into Columbia Coin's general operating accounts.

During some period before it was placed in receivership, the company had been experiencing financial problems. The Lockes became aware of Ladum's speculative trading and the company's excessive commitments at least as

early as October, 1978. Despite the obvious severity of Columbia Coin's financial problems, the Lockes continued to trust Ladum to handle its obligations and transactions.

■       As previously noted, this is an appeal from a summary judgment in favor of defendants. The parties filed cross-motions for summary judgment as to each of plaintiffs' claims, agreeing that the relevant facts were not in dispute. The parties also agreed that the question of whether Columbia Coin's sale of gold and silver coins constituted sales of securities is a question of law. Plaintiffs now urge on appeal that material issues of fact do exist with respect to defendants' state of mind and knowledge of the fraudulent activities of defendant Ladum which preclude summary judgment with respect to plaintiffs' second and third claims of securities fraud.[3] These issues only become relevant, however, if the trial court erred in its determination that Columbia Coin's sales of gold and silver coins under the circumstances of this case were not the sale of securities.

■       Briefly summarized, plaintiffs argue that Columbia Coin's sale of coins to plaintiffs constituted a sale of securities under both federal and state law because defendants[4] failed to purchase certain coins and designate them as belonging to plaintiffs. Instead, plaintiffs argue, defendants commingled plaintiffs' funds with the general operating funds of the company, thereby placing plaintiffs' investments at risk and involving their fortunes with those of Columbia Coins.

We first consider plaintiffs' federal law claim. Plaintiffs allege that defendants, in violation of the federal Securities Act of 1933, fraudulently induced plaintiffs to purchase unregistered securities.[5] The 1933 Act, as amended

---

[3] Defendants incorrectly contend that plaintiffs, having agreed at trial that no genuine issue of fact existed as to any of plaintiffs' claims, are now precluded from arguing on appeal that fact questions exist. *See Hanneman v. Jones,* 45 Or App 1005, 1009, 609 P2d 912 (1980); *Klimek v. Continental Ins.,* 57 Or App 435, 441, 645 P2d 553 (1982).

[4] Under the applicable provisions of the state and federal securities laws, defendants may be held personally liable for securities fraud in spite of the fact that the sales were made by the corporation. ORS 59.115(3); 15 USC § 77o.

[5] Plaintiffs' federal claims are broadly grounded on the Securities Act of 1933. We interpret the allegations to assert violations of section 12, (2) of the Securities Act (15 USC § 77l(2)), which creates civil liability when one sells securities through the use of untrue interstate communications, and section 17, (a) (15 USC § 77q(a)), which makes it unlawful to obtain money by misleading statements or conduct in the sale of securities. Jurisdiction of these violations is concurrent in District Courts of the United States and state courts under section 22 (a) (15 USC § 77v(a)).

(15 U.S.C. § 77b(1)),[6] defines "security" as *inter alia,* any investment contract. The Supreme Court stated in *S.E.C v. C. M. Joiner Leasing Corp.,* 320 US 344, 351, 64 S Ct 120, 88 L Ed 88 (1943) that:

> "The reach of the [Securities] Act does not stop at the obvious and common place. Novel, uncommon or irregular devices, whatever they appear to be are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character or commerce as 'investment contracts' * * *."
> *See also Tcherepnin v. Knight,* 389 US 332, 336, 88 S Ct 548, 19 L Ed 2d 564 (1967).

The circuit courts, applying the *Joiner* mandate, have "construed the definition [of securities] liberally." *Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc.,* 474 F2d 476, 481 (9th Cir 1973) *citing S.E.C v. C. M. Joiner Leasing Corp., supra. See, e.g., Smith v. Gross,* 604 F2d 639 (9th Cir 1979) (sale of worms); *Glen-Arden Commodities, Inc. v. Constantino,* 493 F2d 1027 (2d Cir 1974) (scotch whiskey); *Securities & Exch. Com. v. Koscot Inter., Inc.,* 497 F2d 473 (5th Cir 1974) (sale of franchises); *Continental Marketing Corp. v. Securities & Exchange Com'n,* 387 F2d 466 (10th Cir 1967), *cert den* 391 US 905 (1968) (sales of live beavers). The variety of schemes that have been held to be securities under the act, particularly through the use of "investment contract"[7] analysis, demonstrates the courts' commitment to ignore form and to analyze the substance of a transaction.

■    The starting point for determining whether defendants sold investment contracts is the now-classic definition

---

[6]    "(1) The term 'security' means any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust, certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."

[7]    Plaintiffs do not expressly use the term "investment contract." Nevertheless, their arguments and application of case law seem to label defendants' sales as investment contracts.

outlined in *S.E.C v. Howey Co.*, 328 US 293, 301, 66 S Ct 1100, 90 L Ed 1244 (1946):

> "The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."

In *United Housing Foundation, Inc. v. Forman,* 421 US 837, 852, 95 S Ct 2051, 44 L Ed 2d 621 (1975), the Supreme Court restated the *Howey* test:

> "* * * The touchstone [of an investment contract] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others."

Defendants concede "the presence of an investment * * * with the expectations of a profit." Under *Howey-Forman,* the questions in this case are whether a "common enterprise" existed and whether plaintiffs expected that their profits would be "derived from the entrepreneurial or managerial efforts" of Columbia Coin. 421 US at 852.

(1) *Common Enterprise*

*Howey* involved the sale of land contracts for units of a citrus grove together with a service contract for cultivating and marketing citrus crops. In reversing a Court of Appeals determination that no common enterprise existed, the Supreme Court emphasized that the relevant consideration was whether the success of the enterprise depended upon the efforts of the promoter:

> "[Investors] have no desire to occupy the land or develop it themselves; they are attracted solely by the prospects of a return on their investment. Indeed, individual development of the plots of land that are offered and sold would seldom be economically feasible due to their small size. Such tracts gain utility as citrus groves only when cultivated and developed as component parts of a larger area. A common enterprise managed by respondents or third parties with adequate personnel and equipment, is therefore essential if the investors are to achieve their paramount aim of a return on their investment." *S.E.C. v. Howey, Co., supra,* 328 US at 300.

The Ninth Circuit has interpreted *Howey's* "common enterprise" element to mean a scheme in which the "fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking those investments or of

third parties." *Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc., supra,* 474 F2d at 482 n 7. Under *Turner,* the pooling of interests combined with the pro-rata sharing of profits—characterized as "horizontal commonality"—is not required in order to satisfy the common enterprise requirement. *Brodt v. Bache & Co., Inc.,* 595 F2d 459 (9th Cir 1978); *Hector v. Wiens,* 533 F2d 429, 433 (9th Cir 1976).[8] The commonality required is vertical: between the investor and the promoter.[9]

Plaintiffs argue that defendants' diversion of their purchase funds, combined with the commingling of those funds, satisfies *Turner's* commonality requirement and, thus, establishes a common enterprise. Although some courts have followed this rationale, *see, e.g., Matter of Western Pacific Coin & Silver Exchange,* Blue Sky L Rep (CCH) ¶ 71,203 (1975) (Iowa Ins. Comm.), we prefer the reasoning in *McClellan v. Sundholm,* 89 Wash 2d 527, 574 P2d 371 (1978), which also involved the sale of silver for investment purposes. In that case, a company's services included selection of silver, storage, ongoing consultation and advice regarding the silver market and resale of the silver for the purchaser. An investor delivered a cashier's check to the company and was told that his silver would arrive within two weeks. It did not. Instead, the money paid was used by the company for expenses and speculation. The trial court determined that a security existed because of the company's diversion and commingling of funds. The Washington Supreme Court disagreed with the trial court's reasoning:

> "The existence of a security in this case is not dependent solely on [the defendant's] diversion of appellant's funds, as found by the trial court. That diversion was only one characteristic of the larger investment scheme involving reliance on the actions of others for the success of the profit-seeking venture." *McClellan v. Sundholm, supra,* 89 Wash 2d at 533.

---

[8] This approach differs from that of other circuits. *See, e.g., Hirk v. Agri-Research Council, Inc.,* 561 F2d 96 (7th Cir 1977) (imposing strict pooling requirements).

[9] Vertical commonality requires that the investor and promoter be involved in some common venture, while not requiring that other investors also be involved in that venture. In *Hector v. Wiens, supra,* for example, a farmer, a feedlot operator and a bank were involved in a common enterprise. The court stated that if both the farmer and the bank were dependent upon the success of the feedlot operator for the success of their investment, a common enterprise would exist. 533 F2d at 433.

In reaching that conclusion, the court noted that *Howey's* "common enterprise" test was satisfied because the investor was encouraged to rely on the company for advice on changes in the silver market as well as storage of the silver: "The intended ongoing relationship between the purchaser and the company emphasizes this aspect of the common enterprise." 89 Wash 2d at 532.[10]

The factors other courts have used to determine "vertical commonality" include: (1) whether the success of the investments collectively depended on promoter expertise, *Securities & Exch. Com. v. Koscot Inter., Inc., supra,* 497 F2d at 479; (2) whether the defendant rendered investment counseling concerning what to buy or when to buy or sell, *S.E.C v. Continental Com. Corp.,* 497 F2d 516, 522-23 (5th Cir 1974); (3) whether the investor's purchase was on margin and the margin investors' purchase funds were pooled and invested by the defendant, *Jensen v. Continental Financial Corporation,* 404 F Supp 792, 803-04 (D Minn 1975); (4) whether the defendant guaranteed repurchase or refund, *United States v. Carman,* 577 F2d 556, 563-64 (9th Cir 1978); and (5) whether the defendant utilized investment-oriented advertising to lure investors into purchasing. *S.E.C v. C. M. Joiner Leasing Corp., supra,* 320 US at 346. In short, courts typically have found a common enterprise when a scheme is advertised and promoted as an investment requiring the investor to entrust the promoters with both the work and the expertise to make the investment pay off. *Glen-Arden Commodities, Inc. v. Constantino, supra,* 493 F2d at 1035.

The facts of the present case bear little resemblance to the cited cases. Defendants did not sell on margin, solicit any of the purchases, advise on resale, guarantee a profit or repurchase or make any selection decisions for their investors. Plaintiffs' purchases were for cash, and each plaintiff had the option of immediate possession of the coins. In fact, in nearly all of Columbia Coin's sales, the purchaser, on tender of the purchase funds, took immediate possession of the coins.

---

[10] Several Securities and Exchange Commission staff opinions have reached the same conclusion where these services are offered. *See, e.g., Jim Halperin, Inc.* [1976-77 Transfer Binder] Fed Sec L Rep (CCH) ¶ 80,715; *Joseph L. Aurichio* [1976-1977 Transfer Binder] Fed Sec L Rep (CCH) ¶ 80,996; *but see* Texas Arizona Mining Co., Inc., [1971-72 Transfer Binder] Fed Sec L Rep (CCH) ¶ 78,626. (Negotiable contract, redeemable in silver on a date certain, to be guaranteed by a financial institution and sold as an investment, is not an investment contract.)

## (2)  *Profits Derived Solely From Others' Efforts*

Even if plaintiffs could establish a common enterprise, their theory fails *Howey-Forman's* fourth test: profits to come solely from the efforts of others. *Turner* broadly read the "solely" requirement, concluding that the term should be construed realistically "so as to include within the definition those schemes which involve in substance, if not form, securities." *United Housing Foundation, Inc. v. Turner, supra,* 474 F2d at 482. The test applied in *Turner* was "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." 474 F2d at 482. Several cases have applied this interpretation. *See, e.g., Securities & Exch. Com. v. Koscot Inter., Inc., supra,* 497 F2d at 478; *Jensen v. Continental Financial Corp., supra,* 404 F Supp at 804-05.

Plaintiffs argue that this element of the test is satisfied, because defendants had complete managerial control over the commingled funds. Assuming that defendants had complete control, nevertheless plaintiffs' expectations of making a profit were not "derived from the entrepreneural and managerial efforts" of Columbia Coin.[11] In each of the cases relied on by plaintiffs, the investors were dependent upon the defendant's expertise in order to realize any gain from their investment.

Plaintiffs urge us to apply the federal "risk capital" analysis. This analysis is applied where:

"The investor, even if he can participate in or control some phase of the enterprise, is gambling 'risk capital,' where there is less than an even chance of success, against the

---

[11] Plaintiffs' misapplication of the *Howey-Forman* test illustrates the importance of reading the test as a whole. Plaintiffs would rearrange the second and fourth elements of that test and thereby effectively obliterate the distinction between the purchase of a security and the purchase of a commodity. Parsed, plaintiffs' application of *Howey-Forman* would read: (1) an investment of money (plaintiffs purchased silver or gold coins) (2) with the expectation of making a profit (plaintiffs purchased the coins expecting their value to increase), (3) in a common enterprise (in "economic reality" plaintiffs risked losing their funds because defendants commingled plaintiffs' and the company's money) (4) to be derived from the entrepenurial and managerial efforts of others (defendants had complete managerial control over the commingled funds). Plaintiffs' misstatment of *Howey-Forman* modifies the investment contract analysis so that the investor need have no expectation of profit to be made through Columbia Coin's management and control.

opportunity for large profit. Because of the substantial risk of loss, to include such operations within the purview of the 1933 Act would fulfill the purpose of protecting passive investors by compelling disclosure of disquieting aspects of a scheme." *Mr. Steak, Inc. v. River City Steak, Inc.,* 324 F Supp 640, 646 (D Colo 1970).

The Ninth Circuit has confined the "risk capital" analysis to loans used to capitalize an investor's business when the lender risks loss. *AMFAC Mtg. Corp. v. Arizona Mall of Tempe,* 583 F2d 426 (9th Cir 1978); *United California Bank v. THC Financial Corp.,* 557 F2d 1351 (9th Cir 1977); *El Khadem v. Equity Securities Corporation,* 494 F2d 1224 (9th Cir 1974). The transactions in this case fall outside the ambit of the federal risk-capital criteria. Columbia Coin was a going concern long before plaintiffs made their investments. These were not loans, nor were they sales made in order to raise capital.[12]

▮     We turn now to a consideration of plaintiffs' state law claims. The definition of "security" in ORS 59.015(13)(a) is substantially similar to the definition of "security" in the federal Securities Act and includes the term "investment contract."[13] In order to further the remedial purposes of Oregon's Blue Sky laws, we liberally construe them to afford the greatest possible protection to the public. *Adamson v. Lang,* 236 Or 511, 516, 389 P2d 39 (1964). The label attached to the subject of defendants' sales, gold and silver coins, is therefore not dispositive of the nature of the transaction. The court in *Forman* reiterated the basic principle that has guided all of the courts' decisions in this area:

---

[12] The court noted in *Cordas v. Specialty Restaurants, Inc.,* 470 F Supp 780, 789 (D Or 1979), that the risk capital test is more narrowly applied in federal courts than it is in Oregon.

[13] ORS 59.015(13)(a) provides:

"(13)(a) 'Security' means a note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in a pension plan or profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under which title or lease, or, in general, any interest or instrument commnly known as a 'security,' or any certificate of interest or participation in, temporary or interim certificates for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing."

" '[I]n searching for the meaning and scope of the word "security" in the Act, form should be disregarded for substance and the emphasis should be on economic reality.' " *United Housing Foundation, Inc. v. Forman, supra,* 421 US at 848, *quoting Tcherepnin v. Knight, supra,* 389 US at 336 (1967).

The Oregon Supreme Court, in *Pratt v. Kross,* 276 Or 483, 555 P2d 765 (1976), recognized that *Howey* is unduly restrictive, 276 Or at 489, and therefore adopted *Forman's* restatement of the *Howey* test:

"[T]he requirements [of an investment contract] are (1) an investment of money (or money's worth), (2) in a common enterprise, (3) with the expectations of a profit, (4) to be made through the management and control of others." 276 Or at 497.

The court acknowledged, however, that *Pratt's* formulation of an "investment contract," like *Howey's,* may not be applicable to all situations:

"By setting forth this modification we do not mean to imply that no other modifications in the rule will be forthcoming in situations in which reason seems to so direct when the purpose of the statutory scheme is considered." 276 Or at 497.

For the purposes of this case, the application of the *Pratt* test requires the same analysis and yields the same result as does the *Howey-Forman* test. Plaintiffs fail to show a "common enterprise" or *Pratt's* fourth element: that the expectation of a profit was "* * * to be made through the management and control of others."

We consider separately plaintiffs' arguments that the facts of this case show an "evidence of indebtedness,"[14] and thus a security, under *State ex rel Healy v. Houston,* 42 Or App 287, 600 P2d 886 (1980), and that defendants' sales were securities under the Oregon courts' interpretation of the risk capital test.[15]

---

[14] "Evidence of indebtedness," like "investment contract," is subsumed within both the federal and state definition of "security." *See* 15 USC § 77b(1), n 6, *supra;* ORS 59.015(13)(a), n 13, *supra.*

[15] Plaintiffs contend, and as noted above, n 12, one federal court has remarked that Oregon's risk capital test may be broader than the federal test.

Plaintiffs urge that the case at bar is controlled by *Houston* and is therefore distinguishable from a purchase of a commodity. In *Houston,* Western Pacific Gold and Silver Exchange Corp. (Western Pacific) had been selling certificates for future silver deliveries at 30, 60, and 90-day intervals. The company failed to deliver silver purchased by customers, and the Corporation Commissioner brought an action against the company for violation of the state securities law. *State ex rel Healy v. Houston, supra,* 42 Or App at 289. The securities examiner considered the company's 60-and-90 day certificates to be "evidence of indebtedness." Similarly, this court concluded that the 60 and 90 day certificates represented "future obligations" and thus were securities.[16] The distinction between an "evidence of indebtedness" and an "investment contract" raises important questions of whether the proof necessary to establish an "evidence of indebtedness" differs from the proof needed to show an "investment contract" and, if so, whether the transaction in this case produced an "evidence of indebtedness."

In *Matter of Western Pacific Coin & Silver Exchange, supra,* the principal question was whether the invoices or receipts issued by Western Pacific constituted securities under the Iowa Blue Sky Laws. Western Pacific's scheme in Iowa was similar to its Oregon scheme analyzed in *Houston.* The Iowa Insurance Commissioner found that the invoice and buy-back scheme constituted an "evidence of indebtedness" and was therefore a security. The defendants argued that the invoices only represented liability for undelivered silver. The Commissioner disagreed:

> "The guarantee to buy back the bars of silver and the testimony that delivery was not necessary to effect such a buy-back, plus testimony * * * that this was indeed done, changes the invoices from a mere liability to deliver silver into an evidence of indebtedness." *In Matter of Western Pacific Coin & Silver Exchange, supra.*

The critical facts that existed in Western Pacific's scheme in Iowa as well as in Oregon were: (1) promotions (2)

---

[16] The trial court in *Houston* held that the sale was an "evidence of indebtedness" as well as an "investment contract." Because this court held that sales of 60 and 90 day certificates represented "future obligations" which were thus "evidence[s] of indebtedness," this court did not analyze whether the sales involved on "investment contract."

that guaranteed the company's repurchase of the silver certificates and (3) evidence that showed that the transactions took place without the silver ever changing hands. Those facts show that Western Pacific's "invoices" were more than an evidence of the sale of a commodity. In fact, its investors were relying on the company's representations that the certificate itself evidenced the general liability of the company to pay the current market value of silver at the time repurchase was demanded.

■ We conclude that the facts of the present case do not show an "evidence of indebtedness." First, it is undisputed that each plaintiff contacted Columbia Coin in order to arrange a purchase of coins. Second, Columbia Coin offered no buy-back guarantee to its customers. Finally, more than 95 percent of Columbia Coin's business involved transactions which were immediately completed; payment and coins changed hands at the time of sale. The essential facts giving rise to an "evidence of indebtedness" are therefore absent in this case.

Plaintiffs argue alternatively that Oregon's risk capital test is broader than the federal test and that, under that test, defendants' sales were securities. Plaintiffs' contentions are fully met by our opinion in *Black v. Corporation Division,* 54 Or App 432, 634 P2d 1383 (1981), and the cases cited therein. Those cases establish that, for the purpose of Oregon law, the "risk capital" test includes consideration of the time a business has been in operation, as well as (1) whether the value provided by the investor (2) was furnished on the basis of the promoter's representations that gave rise to a reasonable understanding that (3) a benefit of some kind would (4) accrue to the offeree as a result of the operation of the enterprise, and (5) a portion of the investor's value is subjected to the risks of the enterprise.

This analysis has essentially two prongs. The first four elements examine the promoter's relationship to the investor by focusing on the promoter's representations to the investor to determine the investor's reasonable expectations.[17]

---

[17] For example, in *S.E.C v. C.M. Joiner Leasing Corp., supra,* 320 US at 352-53, the court stressed the importance of determining "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, the economic inducements held out to the prospect." *See also Securities & Exch. Com'n v.*

The last element evaluates the financial stability of the enterprise at the time of the investment to determine whether the investor's value was at risk in the enterprise. If both prongs are satisfied, the sale is a security.

■ The facts of the present case do not satisfy the first prong of this test. Plaintiffs do not contend that defendants made any representations that gave rise to an expectation that some value would accrue to them as a result of the operation of Columbia Coin. We find no violation of the securities laws.

We next consider plaintiffs' claims for common law fraud and conversion together. They contend that, as a matter of law, defendants are liable for common law fraud. Their complaint alleges:

"XX

"Plaintiffs each purchased or attempted to purchase coins by or through defendants. Dave Thompson purchased or attempted to purchase coins as trustee for Stephen Bates. Mardan Management, Ltd. is a foreign corporation. Dolores Bailey, by assignment, claims for herself and Floyd Miller.

"XXI

"Defendants are individuals who, at all times mentioned herein, were the officers and managing agents of Columbia Coin Company, Inc. and who, at all times mentioned herein, were doing business within Multnomah County, State of Oregon.

"* * * * *

"XXIII

"Defendants individually in the course of the offer and sale of the coins to plaintiffs, made the following representations which were untrue and were known to be untrue by defendants when made:

"A. That the coins would be purchased for the plaintiffs by Columbia Coin Company, Inc. and defendants;

---

*Brigadoon Scotch Dist., Ltd.*, 388 F Supp 1288, 1290-91 (SD NY 1975). A Senate committee report commenting on the purpose of the act stated:

"The aim [of the Securities Act] is to prevent further exploitation of the public by the sale of unsound, fraudulent, and worthless securities through misrepresentation; to place adequate and true information before the investor; to protect honest enterprise, seeking capital by honest presentation, against the competition afforded by dishonest securities offered to the public through crooked promotion. * * *" Senate Committee on Banking and Currency, S. Rep. No. 47, 73d Cong., 1st Sess. 1 (1933).

"B. That the coins at all times would be stored at the premises of Columbia Coin Company, Inc.; or in the case of Mardan Management, Ltd. at the Canadian Imperial Bank of Commerce;

"C. That a storage fee of $7.00 or $7.50 per year would be charged to plaintiffs as the cost of the physical storage of their coins;

"D. That plaintiffs would be able to recover their property at any time upon demand;

"E. That the money paid by plaintiffs would be used to puchase specific coins when in fact it was used to meet the general obligations of Columbia Coin Company, Inc.

"F. Failed to disclose that Columbia Coin Company, Inc. was unable to meet its obligations as they came due and that its liabilities exceeded its assets."

■ Plaintiffs contend that granting summary judgment for defendants was error, because "there was evidence to support the allegation that the fraudulent representations and nondisclosures were made by or with the knowledge of defendants." Plaintiffs support their argument by cataloging defendants' actions during the latter part of 1978, immediately prior to Columbia Coin's insolvency. Plaintiffs do not, however, point to any evidence that demonstrates that defendants themselves made any representations to any of the plaintiffs. Defendants' evidence in support of their motion showed that they had no personal contact with any of the plaintiffs. Plaintiffs' attempt to argue a derivative liability is based on the fact that defendants were officers of the corporation responsible for the sales. Plaintiffs' action, however, is not against the corporation, and their complaint does not allege that defendants are liable for the statements of others. The trial court did not err in granting summary judgment as to plaintiffs' claim for fraud.

■ Plaintiffs are faced with the same problem on their conversion claim. The complaint alleges that defendants exercised dominion and control over plaintiffs' coins. In their brief, they allege that defendants obtained money from the plaintiffs in exchange for receipts for immediate delivery of silver or gold coins. They then state:

"If defendants never intended to acquire specific coins for plaintiffs, then their conduct was fraudulent, and they wrongfully acquired possession of plaintiffs' purchase money, constituting conversion."

Plaintiffs do not, however, point to any evidence that defendants were in any personal way directly involved with obtaining plaintiffs' money.

Plaintiffs further argue that defendants were fully aware of Columbia Coin's practices and therefore are liable both as agents and managers. That is not the theory of liability alleged in the complaint and, even if it were, the facts adduced on summary judgment do not support it. As to Jost's bag of coins, the undisputed evidence is that defendants were not aware of the circumstances of its disappearance. Plaintiffs allege that "defendants were both personally involved in learning of the disappearance of plaintiff Jost's coins and in failing to take any action." That is not an allegation of conversion.

The trial court did not err in granting summary judgment on plaintiffs' claim for conversion.

■ Finally, plaintiffs urge that the trial court erred in awarding defendants the costs of taking depositions as an element of their cost bill. In *Kendall v. Curl*, 222 Or 329, 340, 353 P2d 227 (1960), the court stated:

> "The trial judge, who is in the best position to decide whether a deposition is, or has become, necessary, should approve the charge or a part of the charge for a deposition actually used or taken in good faith for testimonial purposes. Ordinarily, the matter is left to the discretion of the trial judge."

Similarly, *Gleason v. International Multi-Foods*, 282 Or 253, 261 n 3, 577 P2d 931 (1978), in approving an award of costs for depositions used in a summary judgment motion, states that "we have held that whether the taking of a deposition 'was necessary' is ordinarily a matter to be left to the discretion of the trial court." In the present case the trial court did not abuse its discretion.

Affirmed.