Argued and submitted April 22, reversed and remanded August 3, reconsideration denied October 14, petition for review denied November 22, 1983 (296 Or 120)

## EVERTS et al,
*Appellants,*

*v.*

## HOLTMANN et al,
*Defendants and Third-Party Plaintiffs,*
## McLEOD,
*Defendant and Third-Party Plaintiff, Respondent,*

(A8004-01985; A25429)

667 P2d 1028

Peter C. Richter, Portland, argued the cause for appellants. With him on the brief were James N. Westwood, and Miller, Nash, Yerke, Wiener & Hager, Portland.

S. Ward Greene, Portland, argued the cause for respondent. With him on the brief were Greene & Perris; and Marjorie Anne Spiers and McMenamin, Joseph, Babener & Carpenter, Portland.

Before Richardson, Presiding Judge, and Van Hoomissen and Newman, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

Plaintiffs, trustees of two pension and profit sharing trusts, brought this action, alleging that defendants had unlawfully offered and sold securities to the trusts in violation of ORS 59.115(1)(b) and ORS 59.115(3).[1] The trial court gave a summary judgment in favor of defendant McLeod, and plaintiffs appeal.[2] The issue is whether McLeod sustained his burden of showing that there was no genuine issue of material fact as to him and that he was entitled to judgment as a matter of law. Viewing the record in the light most favorable to plaintiffs, we conclude that issues of fact were raised by the pleadings. Accordingly, we reverse and remand.

Defendants Labbe, Holtmann and McLeod were directors of Imperial Furniture Corporation. Labbe and

---

[1] ORS 59.115(1)(b) provides:

"(1)  Any person who:

"* * * * *

"(b)  Offers or sells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable as provided in subsection (2) of this section to the person buying the security from him."

ORS 59.115(2)(a) fixes the liability of one who offers or sells securities in violation of ORS 59.115(1)(b):

"(2)  The purchaser may recover, in addition to costs and reasonable attorney fees at trial and on appeal:

"(a)  Upon tender of the security, the consideration paid for the security, and interest from the date of payment at the rate of six percent per annum, or at the rate provided in the security if the security is an interest-bearing obligation, less any amount received on the security[.]"

ORS 59.115(3) provides in relevant part:

"Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every partner, officer, or director of such seller * * * is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that he did not know, and, in the exercise of reasonable care, could not have known, of the existence of the facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with him."

[2] Plaintiffs filed an alternative motion for reconsideration or for entry of a final judgment pursuant to ORCP 67B. Reconsideration was denied. The court then entered a final order and judgment of dismissal as to McLeod, affirming its earlier order and making additional findings to support entry of a final appealable judgment.

Holtmann were officers and employes of Imperial and drew monthly salaries. McLeod was neither an officer nor an employe. He did not participate in the day-to-day operations of the corporation. During 1978 and 1979, he regularly attended meetings of the board of directors. He relied on Labbe and Holtmann, as well as on Bogumil, Imperial's accountant, to give him accurate information about Imperial's day-to-day operations and its financial status. Late in 1978, McLeod advised Labbe and Holtmann that he wished to redeem his Imperial stock. This request was under consideration at the time of the sale of stock to the trusts. At that time, McLeod generally was aware that the other defendants were interested in raising capital for Imperial by selling stock. He was also aware that there were prospective buyers for the stock. He did not meet or speak with plaintiffs prior to the sale, nor did he involve himself directly with the sale of the stock because, as a stock broker, he feared a potential conflict of interest would be involved in his raising money for Imperial.

An attorney prepared a prospectus, disclosure letter and subscription agreement based on information provided by Holtmann, Labbe and Bogumil. McLeod did not participate in the preparation of those documents, believing that he could rely on the information, opinions, reports and statements of Labbe, Holtmann and Bogumil. He had been associated with them for years and had no reason to doubt their reliability or competency.

The prospectus and other documents were reviewed by plaintiffs' attorney, who advised them against purchasing the stock. The prospectus was also delivered to plaintiffs. Bogumil's recollection was unclear as to whether he actually went over the prospectus with them. Plaintiff Everts acknowledged reading the prospectus and accompanying financial statements. He also discussed the purchase with Bogumil and plaintiffs' attorney, but he made no independent investigation of Imperial, the market or the furniture industry in general. Everts did not consider himself a sophisticated investor.

The prospectus stated *inter alia* that Imperial was involved in a highly competitive business and that its success, if any, would be directly affected by its ability to compete in the marketplace. It disclosed that "many of [Imperial's] competitors have far greater resources and expertise than does the Company" and that "the Company can make no assurances

that its past financial history as evidenced by the attached financial statement will continue in the future." Under a heading entitled "Risk Factors," it warned:

"Purchase of the Company's preferred stock is a speculative investment and should be contemplated only if the investor is economically sophisticated and able to bear the risk of loss of the entire investment. This investment in the company is not suitable for anyone whose net worth is less than $100,000 excluding home, home furnishings and automobiles, or who may require immediate cash repayment or distributions from his investment."

The prospectus invited potential purchasers to contact either Labbe or Holtmann to review the company records.

Under a heading entitled "Conflict of Interest" the prospectus disclosed that Labbe and Holtmann were officers and shareholders in the Brass Shop, Inc., and The Family Room, Inc. It stated that Imperial had engaged in financial transactions with both of those corporations and that those transactions were beneficial to Labbe and Holtmann. It stated that "there are no assurances made that the company's business relationships with the Brass Shop, Inc., and The Family Room, Inc., will be of benefit to the Company or its stockholders, other than Messrs. Labbe and Holtmann." It further disclosed that McLeod was desirous of redeeming his Imperial stock and that a portion of the proceeds from the sale of the new stock might be used for that purpose. It revealed that "there can be no assurance that additional financing needed could be obtained by the Company, if at all, on terms acceptable to the Company." The disclosure letter that was signed by Holtmann and Labbe stated:

"* * * The company stock offered herein, must be considered an illiquid investment in that there is no ready market available for the sale of the stock. The preferred stock offered herein must be considered A HIGH RISK INVESTMENT APPROPRIATE ONLY FOR A SOPHISTICATED INVESTOR WHOSE NET WORTH EXCEEDS $100,000 EXCLUDING PERSONAL RESIDENCE.

"Again, we urge your independent investigation prior to signing the enclosed subscription agreement."

Finally, the subscription agreement asked that any purchaser warrant that he had read the disclosure letter and that he "has the knowledge and experience in financial and

business matters necessary to evaluate the merits and risks involved in the investment." The securities sold to the trusts were 600 newly issued shares of Imperial stock for a price of $60,000. After a disastrous year, during which Imperial's principal market collapsed, it was adjudicated a bankrupt. No distributions were made to any shareholder.

The only questions in this appeal are those dealing with plaintiffs' allegations that *McLeod* violated the Oregon Securities Law, specifically the vicarious liability statute, ORS 59.115(3), in connection with the offer and sale of Imperial stock. In their complaint plaintiffs alleged that Imperial, and thus McLeod, failed to disclose that: (1) Imperial's inventory was less than shown in its financial statements, (2) its true financial condition was not as represented in its financial statements, (3) it had delinquent accounts receivable, (4) it was seeking to borrow substantial amounts of money, and (5) it had no purchasers for the remaining $240,000 worth of stock it had supposedly offered for sale. Plaintiffs further alleged that Labbe and Holtmann, and thus McLeod under ORS 59.115(3), affirmatively misrepresented that: (1) the market for mobile homes, particularly in Alaska, was strong, whereas actually it was depressed, (2) Imperial would obtain a reasonable profit from the sale of merchandise to two other corporations, whereas the sales were at a loss, and (3) stock in other corporations owned by Labbe and Holtmann had been paid for by them personally, whereas payment in fact had been made by Imperial.

McLeod admitted that he was a director of Imperial at the time the securities were offered and sold, but he denied violating the Oregon Securities Law. Specifically, he denied that any of the alleged omissions or disclosures were *material.* He also denied that he knew or reasonably could have known that the alleged omissions or disclosures were misleading.

The trial court found that (1) the alleged omissions were not material and (2) that McLeod did not know and could not reasonably have known that the alleged omissions or representations were misleading. The question is whether the trial court properly could rule as a matter of law that the omissions or representations were not material, and, if the court could not do so, whether it could rule as a matter of law that

McLeod did not know or could not reasonably have known that the alleged omissions or representations were misleading.

■    In 1967, the Oregon Securities Law was amended to add ORS 59.115(1)(b), which adopted substantially the language in the federal Securities Act of 1933, 15 USC § 77(1) and (2). Accordingly, decisions construing the provisions of that Act are aids in interpreting and applying Oregon law. *Karsun v. Kelley,* 258 Or 155, 161, 482 P2d 533 (1971). In determining materiality in the context of a proxy solicitation case, the Supreme Court adopted the following test of the materiality of an omission:

> "* * * An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. * * *" *TSC Industries, Inc. v. Northway, Inc.,* 426 US 438, 449, 96 S Ct 2126, 48 L Ed 2d 757 (1976).

This standard has been followed by other federal courts in cases involving the federal counterpart to ORS 59.115. *Spatz v. Borenstein,* 513 F Supp 571 (ED Ill 1981); *Alton Box Bd. Co. v. Goldman, Sachs & Co.,* 560 F2d 916 (8th Cir 1977).

The Supreme Court has also noted that a determination of materiality on summary judgment presents special problems:

> "The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment. *Johns Hopkins University v. Hutton,* 422 F. 2d 1124, 1129 (CA4 1970). See *Smallwood v. Pearl Brewing Co.,* 489 F. 2d, at 604; *Rogen v. Ilikon Corp.,* 361 F. 2d 260, 265-267 (CA1 1966)." (Footnotes omitted.) *TSC Industries, Inc. v. Northway, Inc., supra,* 426 US at 450.

Because the question here is whether the omissions were material as a matter of law, we consider the converse of the Supreme Court's analysis, *i.e.,* whether the alleged omissions were so obviously *unfCF9important that reasonable minds could not differ on their materiality.*

■ McLeod first argues that a reasonable investor could not consider the alleged omissions and misrepresentations material in light of the " 'total mix' of information made available." *See TSC Industries, Inc. v. Northway, Inc., supra,* 426 US at 450. He argues that plaintiffs were warned of the high risk of the investment, potential conflicts between Imperial and its management and Imperial's uncertain prospects for obtaining additional financing. He notes that the documents given plaintiffs cautioned that the proposed investment was "appropriate only for a sophisticated investor whose net worth exceeds $100,000 excluding personal residence" and that it urged potential investors' individual investigation. We conclude that those disclaimers are insufficient to control the materiality of omissions and misrepresentations. ORS 59.115(1)(b) mandates a *full and truthful* disclosure of *material* information. *See Spatz v. Borenstein, supra,* 513 F Supp at 580; *Sanders v. John Nuveen & Co., Inc.,* 619 F2d 1222, 1229 (7th Cir 1980). The mere fact that plaintiffs were urged to inquire further does not vitiate a legal liability flowing from a failure to disclose material information. *Spatz v. Borenstein, supra,* 513 F Supp at 580.

■ McLeod next contends that, in the light of the information given plaintiffs, they could not have reasonably relied on any omissions and misrepresentations. However, ORS 59.115(1)(b) imposes liability without regard to whether the buyer relies on the omission or misrepresentation. *See Sanders v. John Nuveen & Co., Inc., supra,* 619 F2d at 1225 (construing the federal Securities Act of 1933).

Viewing the evidence in the light most favorable to plaintiffs, *see Stanfield v. Laccoarce,* 288 Or 659, 665, 607 P2d 177 (1980), we cannot conclude as a matter of law that no reasonable investor could consider the alleged omissions and misrepresentations *un*important. We do not hold that the question of the materiality of omissions or misrepresentations in connection with the sale of securities may never be decided on summary judgment. In the final analysis, materiality remains an objective question that can be answered as a matter of law

only when reasonable persons could not differ as to the importance of the omissions or misrepresentations. *Securities and Exchange Com'n v. Savoy Industries,* 587 F2d 1149 (DC Cir 1978), *cert den sub nom Zimmerman v. Securities and Exchange Commission,* 440 US 913 (1979), *appeal after remand* 665 F2d 1310 (DC Cir 1981).

We must consider next whether, as a matter of law, McLeod knew or reasonably could have known of the alleged omissions or misrepresentations. If he did not and could not, he would be excluded from liability, ORS 59.115(1)(b), and summary judgment for him would be proper.

In his affidavit, McLeod stated that: (1) he is a non-participating party to the violation, and nothing put him on notice of irregularities he was bound to investigate; (2) as an inactive director, he relied on statements made by active officers and directors of the corporation whose honesty he had no reason to doubt and on information provided by accountants and other professionals retained by Imperial whose competence he had no reason to doubt; and (3) ORS 59.115 should not impose on a director a higher standard of care than is imposed by ORS 57.228[3] and 57.231[4] governing a directors' liability *to a corporation.*

---

[3] ORS 57.228 provides:

"A director shall perform in good faith the duties of a director under this chapter, including the duties of a member of any committee of the board upon which the director may serve, in a manner the director reasonably believes to be in the best interests of the corporation and with the care an ordinarily prudent person in a like position would use under similar circumstances. A person who performs the duties of a director as provided in this section and ORS 57.231 shall not be liable to the corporation on the basis of being or having been a director. In addition to ORS 57.231 (3), a director performing the duties of a director, may rely on information, opinions, reports or statements including financial statements and other financial data, prepared or presented by:

"(1) One or more officers or employes of the corporation whom the director reasonably believes to be reliable and competent in the matters presented;

"(2) Counsel, public accountants or other persons as to matters which the director reasonably believes are within the person's professional or expert competence; or

"(3) A committee of the board which is created under the articles of incorporation or bylaws, and upon which the director does not serve. However, the matters on which the director relies must be within the committee's designated authority. The director must reasonably believe that the committee merits confidence. The director does not act in good faith under this subsection if the director has knowledge concerning the matter in question that would cause the director's reliance to be unwarranted."

[4] ORS 57.231 provides:

There is little authority on the standard of care that an "outside" director must exercise to immunize himself from

"(1) In addition to any liability imposed upon directors of a corporation under ORS 57.228 and otherwise by law:

"(a) Directors of a corporation who vote for or assent to the declaration of any dividend or other distribution of the assets of a corporation to its shareholders contrary to the provisions of this chapter or contrary to any restrictions contained in the articles of incorporation shall be jointly and severally liable to the corporation for the amount of such dividend which is paid or the value of such assets which are distributed in excess of the amount of such dividend or distribution which could have been paid or distributed without a violation of the provisions of this chapter or the restrictions in the articles of incorporation.

"(b) Directors of a corporation who vote for or assent to the purchase of its own shares contrary to the provisions of this chapter shall be jointly and severally liable to the corporation for the amount of consideration paid for such shares which is in excess of the maximum amount which could have been paid therefor without a violation of the provisions of this chapter.

"(c) The directors of a corporation who vote for or assent to any distribution of assets of a corporation to its shareholders during the liquidation of the corporation without the payment and discharge of, or making adequate provision for, all known debts, obligations and liabilities of the corporation shall be jointly and severally liable to the corporation for the value of such assets which are distributed, to the extent that such debts, obligations and liabilities of the corporation are not thereafter paid and discharged.

"(d) The directors of a corporation who vote for or assent to the making of a loan to a director of the corporation, without first obtaining approval of the shareholders if required by ORS 57.226, shall be jointly and severally liable to the corporation for the amount of such loan until the repayment thereof.

"(2) A director of a corporation who is present at a meeting of its board of directors at which action on any corporate matter is taken shall be presumed to have assented to the action taken unless the dissent of the director is entered in the minutes of the meeting or unless the director files a written dissent to such action with the person acting as the secretary of the meeting before the adjournment thereof or forwards such dissent by registered mail to the secretary of the corporation immediately after the adjournment of the meeting. Such right to dissent shall not apply to a director who voted in favor of such action.

"(3) A director shall not be liable under paragraph (a), (b) or (c) of subsection (1) of this section if the director relied and acted in good faith upon financial statements of the corporation represented to the director to be correct by the president or the officer of such corporation having charge of its books of account, or certified by an independent public or certified public accountant or firm of such accountants fairly to reflect the financial condition of such corporation, nor shall the director be so liable if in good faith in determining the amount available for any such dividend or distribution the director considered the assets to be of their book value.

"(4) Any director against whom a claim shall be asserted under or pursuant to this section for the payment of a dividend or other distribution of assets of a corporation and who shall be held liable thereon shall be entitled to contribution from the shareholders who accepted or received any such dividend or assets

liability resulting from omissions or misrepresentations made by officers or "inside" directors of a corporation in the offering and sale of corporate securities. The Seventh Circuit has held that what constitutes reasonable care under the federal act depends on the facts in each case. It declined to impose a strict standard of "reasonable investigation" on every seller covered by the statute. *Sanders v. John Nuveen & Co. Inc., supra,* 619 F2d at 1228. Another federal court has suggested that Congress intended to impose liability if the seller failed "to prove that he exercised reasonable care in investigating the truth of a representation." It held the seller liable by reason of his failure to prove that he "could not have known with the exercise of reasonable diligence" that he had made material omissions and misstatements. *Johns Hopkins University v. Hutton,* 297 F Supp 1165, 1219-20 (D Md 1968).

■　　Plaintiffs contend that McLeod was bound to inquire as to the truth and completeness of the offering documents. They rely on *Gardner v. Donovan,* 47 Or App 97, 613 P2d 1097 (1980). There we allowed summary judgment for the plaintiff in an ORS 59.115 action where the defendant had failed to show facts that could prove that he could not have discovered the facts underlying the violation by reasonable inquiry. *Gardner v. Donovan, supra,* 47 Or App at 102. By our language in *Gardner* we did not intend to impose a duty of inquiry on every director. Rather, we adopt the reasoning in *Sanders* that whether a specific inquiry must be made depends on the facts in each case. Without evidence as to what a reasonable director would have done under these or similar circumstances, we cannot say whether McLeod needed to make further inquiry to immunize himself from potential liability.

■　　We conclude that McLeod's statement in his affidavit that he relied on information received from Imperial's accountant and active officers and directors is insufficient to immunize him as a matter of law. He borrowed that standard from ORS 57.231(3). Under certain circumstances that statute excludes directors from liability *to a corporation* for assenting

---

knowing such dividend or distribution to have been made in violation of this section, in proportion to the amounts received by them respectively.

"(5) Any director against whom a claim shall be asserted under or pursuant to this section shall be entitled to contribution from the other directors who voted for or assented to the action upon which the claim is asserted."

to distribution of dividends and assets of the corporation in excess of its legal and actual ability to do so. A director is excluded if he acts in good faith and relies on financial statements provided him by officers of the corporation or its accountant. ORS 57.231(3) seeks to ensure the solvency of a corporation. ORS 59.115 provides a remedy for fraud in the sale of securities. The two statutes address different problems and, in the absence of evidence of legislative intent to impose on a director the same standard of care, we will not read into the clear language of ORS 59.115 the standard found in ORS 57.228 and ORS 57.231.

■      McLeod contends finally that, as an "outside" director without notice of any suspicious activity, he should not be held liable for the acts of active officers and directors. Those factors go into the mix of facts to be presented to the trier of fact to determine what constitutes reasonable care here, but they do not, as a matter of law, support summary judgment for McLeod.

Reversed and remanded.