**Burr BATTIG; et al., Plaintiffs,**

v.

**James R. SIMON; et al., Defendants.**

**No. CIV.00–972–JO.**

United States District Court,
D. Oregon.

June 20, 2001.

Dennis V. Messoline, Paul R.J. Connolly, Connolly & Doyle, LLP, Dennis L. Dunn, Salem, OR, for Plaintiffs and Pro Se Plaintiff.

James R. Simon, Ignacio, CA, Patti Plunkett, Dallas, TX, Richard J. Tucker, Henderson, NV, Defendants Pro Se.

## OPINION AND ORDER

ROBERT E. JONES, District Judge.

Plaintiffs bring this action against defendants James Simon, Patti Plunkett, and Richard Tucker, alleging seven [1] claims: (1) sale of unregistered securities (against Simon and Plunkett); (2) sale of securities through an omission or misstatement of material fact (against Simon and Plunkett); (3) breach of contract (against Simon); (4) fraud (against Simon and Plunkett); (5) control person liability in the sale of unregistered securities (against Tucker); (6) control person liability in the sale of secu-

---

1. The caption of the Second Amended Complaint lists only five claims.

rities through a misstatement or omission of material fact (against Tucker); and (7) conversion (against Simon).

In earlier proceedings, this court dismissed defendant Margaret Lombardo, a trustee for First Fidelity Acceptance Corporation ("FFAC"), for lack of personal jurisdiction. The case is now before the court on two separate motions for summary judgment filed by the plaintiffs (## 45, 55). The first, filed on behalf of the "trust plaintiffs," is directed solely against Tucker and appears to be limited in scope to Claim 6 of the Second Amended Complaint. The second motion, filed on behalf of the "loan plaintiffs," is directed against defendants Simon and Plunkett and focuses on Claims 1, 2, and 3 of the Second Amended Complaint. As explained below, both motions are granted in part and denied in part.

## STANDARD

Summary judgment should be granted if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c). If the moving party shows that there are no genuine issues of material fact, the non-moving party must go beyond the pleadings and designate facts showing an issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A scintilla of evidence, or evidence that is merely colorable or not significantly probative, does not present a genuine issue of material fact. *United Steelworkers of America v. Phelps Dodge,* 865 F.2d 1539, 1542 (9th Cir.1989).

The substantive law governing a claim determines whether a fact is material. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also T.W. Elec. Service v. Pacific Elec. Contractors,* 809 F.2d 626, 630 (9th Cir.1987). Reasonable doubts as to the existence of a material factual issue are resolved against the moving party. *T.W. Elec. Service,* 809 F.2d at 631. Inferences drawn from facts are viewed in the light most favorable to the non-moving party. *Id.* at 630–31.

## FACTUAL BACKGROUND

The general background of this litigation is set forth in my earlier opinion and order, *see Battig, et al v. Simon, et al,* Civil No. 00–972–JO (Opinion and Order, Dec. 6, 2000)(# 35). The specific factual background for each separate motion is set forth, as necessary, in the discussion below.

## DISCUSSION

I. *MOTION I: Trust Plaintiffs' Motion for Summary Judgment Against Defendant Tucker*

The trust plaintiffs[2] move for summary judgment against Tucker, as an alleged "control person," on their claim for violation of ORS 59.115(1)(b). In support of their motion, trust plaintiffs contend that they invested in FFAC Auto Receivables Trust 2 certificates ("Trust 2 certificates"); that the investments are securities under Oregon securities law; that the securities were sold by "means of an untrue statement of material fact or an omission to state a material fact"; and that Tucker

**2.** The "trust plaintiffs" are plaintiffs who purchased Trust 2 certificates and include Burr and Jean Battig, Lyle and Shirlee Cave Trustees, Gary and Joanne Cosentino, Cotrustees Hillard Hansen, Trustee, Clare and Margery Hoffman, Bernard and Debbie Jueden, Frank and Laura Long, Cotrustees, Dean Maddox, Danforth Martin, Leland Ramos, Trustee, RMS Farms, Inc. President Mildred Schmidt, Jack and Leah Spitzmesser, Shirley Tripp, Trustee, Russell and Aleen Wilson Cotrustees, and Donald and Carole Whigham.

controlled FFAC and is personally liable to them as a "control person" pursuant to ORS 59.115(3).

## A. *Facts Relevant to this Motion*

The following facts are, except as noted, undisputed on the present record. Trust plaintiffs invested $598,828 in the purchase of Trust 2 certificates. Concise Statement of Facts in Support of Plaintiffs' Motion ("Plaintiffs' Statement"), ¶ 1. The Trust 2 certificates were offered for sale through a Private Placement Memorandum ("PPM") dated June 5, 1996. Plaintiffs' Statement, ¶ 2.[3] The PPM identifies the "seller" of the certificates as FFAC Auto Receivables Corporation, and identifies its "sole stockholder" as FFAC, called the "Company" throughout the PPM. Plaintiffs' Statement, Exhibit 1, p. 1. The section entitled "Management of the Company" on page 21 of the PPM identifies Tucker as "Chairman and Chief Executive Officer of the Company." Plaintiffs' Statement, Exhibit 1, p. 37.[4]

The PPM provides the following summary description of the Trust 2 certificates, the seller, and FFAC's business:

> The Seller is a wholly-owned subsidiary of the Company recently incorporated in the State of Delaware in contemplation of the creation of FFAC Auto Receivables Trust–1, which successfully completed a $2,500,000 offering in May, 1996.

> The Company is a purchaser of automobile retail installment sale contracts (hereinafter referred to as "Autoloans") through a nationwide network of factory authorized automobile dealers. On a regular basis, the Company's subsidiaries sell these Autoloans or securitize them through private sales of unrated asset backed securities, payments in respect of which are generated from payments on the related Autoloans. The Company utilizes a third party as an Autoloan servicer and two separate trustees, one to control the collateral and distribution of funds to Certificateholders while the other trustee serves as lienholder of record on vehicle certificates of title securing the Autoloans and acts for third-party financial institutions investing in the Autoloans and asset backed securities. The financing and funding functions for the vast majority of the Autoloans purchased are performed by third-party financial institutions and individuals, not by the Company or its subsidiaries.

> The Company presently purchases Autoloans from approximately 100 franchised automobile dealers secured by new and used automobiles and light trucks. The borrowers are of marginal creditworthiness, but meet the Company's credit criteria relating to stability, ability to pay and willingness to pay.

Plaintiffs' Statement, Exhibit 1, p. 17. The PPM describes the "Offering" of Trust 2 certificates as follows:

> $25,000 minimum per Certificate with a maximum of $10,000,000. The Seller reserves the right to offer up to an additional $2,000,000 of Certificates at its sole discretion.

> Each Certificate bears interest from the date of issuance at a rate of prime rate plus 3¼% (presently 11.50%) per annum, payable monthly in arrears by the inde-

---

3. Tucker denies that the certificates were offered through the PPM, but on this point, the document speaks for itself. *Compare* Plaintiffs' Statement, Exhibit 1, pp. 1, 17–18, with Defendant Tucker's Response to Trust Plaintiff's Concise Statement ("Tucker's Statement"), ¶ 2.

4. Defendant Simon is identified as "Director," and defendant Plunkett as "Vice President" and "Chief Financial Officer." Plaintiffs' Statement, Exhibit 1, pp. 37–38.

pendent Trustee. Certificateholders will be repaid 100% of the principal amount of their Certificates 90 days after delivery of written demand to the Company.

*Id.* The first page of the PPM contains the following warning concerning the degree of risk involved:

> THE CERTIFICATES OFFERED HEREBY INVOLVE A VERY HIGH DEGREE OF RISK AND SHOULD BE PURCHASED ONLY BY PERSONS WHO CAN AFFORD THE LOSS OF THEIR ENTIRE INVESTMENT. SEE "RISK FACTORS."[5]

The PPM also contains the following "blue sky legend" applicable to Oregon residents:

> THESE SECURITIES ARE BEING OFFERED IN A TRANSACTION EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE OREGON SECURITIES ACT PROVIDED BY SECTION 59.035 OF SAID ACT. THE SECURITIES CANNOT BE SOLD OR TRANSFERRED EXCEPT IN A TRANSACTION WHICH IS EXEMPT UNDER SUCH ACT OR PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT UNDER SUCH ACT OR IN A TRANSACTION WHICH IS OTHERWISE IN COMPLIANCE WITH SUCH ACT.

Plaintiffs' Statement, Exhibit 1, p. 11. The PPM contains similar notices to residents of many other states as well. *See* Plaintiffs' Statement, Exhibit 1, pp. 4–15.

The summary of "subscription receipts" from June 11, 1996, through March 18, 1998 (Plaintiffs' Statement, Exhibit 2), re-

veals subscriptions during that time totaling $7,319,766.52, including the trust plaintiffs' subscriptions totaling $598,828. FFAC collapsed in April 1998.

**B.** *Were the Trust 2 Certificates "Securities" Under Oregon Law?*

■ Trust plaintiffs contend that the Trust 2 certificates are "debt instruments" or "investment contracts" that qualify as securities subject to regulation under ORS Chapter 59. Tucker characterizes the certificates as debt instruments, but denies that they qualify as securities. Instead, Tucker contends that the certificates are subject only to Article 9 of the Uniform Commercial Code ("U.C.C."). Defendant Tucker's Response, p. 3.

■ That something may be characterized as a "debt instrument" does not, as Tucker proposes, exempt it from regulation as a security. Under Oregon law,[6] "security" is broadly defined and includes, among other things:

> [A] note, stock, * * * debenture, evidence of indebtedness, * * * investment contract * * * or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificates for, receipt for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

ORS 59.015(19)(a).

■ In keeping with the mandate of *S.E.C. v. C.M Joiner Leasing Corp.*, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88 (1943), courts, including the Oregon appellate courts, construe the definition of "security"

---

**5.** The "risk factors" appear on pages 4–5 of the PPM and include lack of significant operating history, fluctuations in operating results, marginal credit borrowers, competition, dependence on key personnel, no sinking fund, limited liquidity of the seller, limited liquidity of FFAC, dependence on loan sale and securi-

tization transactions, and regulatory limitations. Plaintiffs' Statement, Exhibit 1, pp. 20–21.

**6.** Tucker's suggestion that Texas law governs this securities action, based on language in the Trust Agreement, is without merit.

liberally, to protect the investing public. *See, e.g., Jost v. Locke,* 65 Or.App. 704, 710, 673 P.2d 545 (1983). As the *Joiner* court explained,

> The reach of the [Securities] Act does not stop at the obvious and common place. Novel, uncommon or irregular devices, whatever they appear to be are also reached if it be proved as a matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character or commerce as "investment contracts" * * *.

320 U.S. at 351, 64 S.Ct. 120;[7] *see also Reves v. Ernst & Young,* 494 U.S. 56, 60–61, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990)(in enacting Securities Acts, Congress "recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits'" (citation omitted)).

The trust plaintiffs have not specified which form of security they contend the Trust 2 certificates in question take, arguing instead that under any analysis—as notes, debentures, evidence of indebtedness, investment contracts, or in general—the Trust 2 certificates are, in fact, securities. I agree.

The PPM repeatedly describes the offering as a securities offering with all the appropriate warnings; indeed, the PPM leaves no room for doubt as to the nature of the offering. Tucker's dismissal of the PPM as "for sales agent compliance purposes only" fails to address the overwhelming implication that what was being offered was a sale of unregistered securities. The language of the "Certificate" itself underscores the express representation to investors that what was being offered were securities. The sample Certificate included in the PPM begins with the following disclaimer:

> THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED PURSUANT TO THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE TRANSFERRED OR SOLD UNLESS PURSUANT TO AN AVAILABLE EXEMPTION AND THE SATISFACTION OF CERTAIN OTHER REQUIREMENTS SPECIFIED IN THE SUBSCRIPTION AGREEMENT.

Plaintiffs' Statement, Exhibit 1, p. 72.

■ If the Trust 2 certificates are, as Tucker contends, "notes," then I agree with trust plaintiffs that under *Reves,* the notes qualify as securities. *Reves* established four factors to be evaluated in determining whether a note is a security: (1) the motivation for entering the transaction; (2) the plan of distribution; (3) the reasonable expectations of the investing public; and (4) whether there are any risk reducing factors that would make application of the securities laws unnecessary. *Reves,* 494 U.S. at 66–67, 110 S.Ct. 945; *see also S.E.C. v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125, 1131 (9th Cir. 1991).

In this case, the evidence shows that the seller's purpose was to raise money for the general use of a business enterprise, and the buyers primarily were interested in the profit the notes were expected to generate. It matters not, as Tucker contends, that the profit was in the form of interest. *See Reynolds,* 952 F.2d at 1131.

---

7. Moreover, that an instrument may be subject to Article 9 of the U.C.C. does not, as Tucker supposes, give rise to a presumption that the instrument is *not* a security; to the contrary, the Supreme Court has held that "a note is presumed to be a security * * *." *Reves v. Ernst & Young,* 494 U.S. 56, 67, 110 S.Ct. 945, 108 L.Ed.2d 47 (1990).

Second, the plan of distribution, described above, involved a private offering through the PPM to potential investors on a nationwide basis through, as Tucker concedes, broker-dealers, suggesting the notes, if notes they are, are securities. Third, the PPM and the accompanying documents could not fail to lead an investor to reasonably expect that he or she was making an investment, and a "risky" one at that. Finally, there appear to be no risk reducing factors that would make application of the securities laws unnecessary. On this point, I am not persuaded by Tucker's argument that the Article 9 of the U.C.C. offers the investors sufficient—if any—protection.[8]

In summary, I find that the Trust 2 certificates are securities, and the trust plaintiffs' motion for summary judgment on this issue, therefore, is granted.

### C. Were the Securities Sold by Means of Untrue Statement or Omissions?

■■■ Trust plaintiffs next ask the court to rule that as a matter of law, the sale of the Trust 2 certificates violated ORS 59.115(1)(b), which imposes liability on any person who

> [s]ells a security by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission) * * *.

Trust plaintiffs identify five statements in the PPM that they contend were clear misstatements of material fact. *See* Memorandum in Support of Plaintiffs' Motion, pp. 2–6.

In support of their motion, trust plaintiffs have submitted various financial documents and summaries of financial transactions for the court's consideration. Even assuming that these documents, without more, were sufficient, for purposes of summary judgment, to establish the untruth of or omission to state certain information contained in PPM, trust plaintiffs' submissions are insufficient to compel the ruling they seek.

The Oregon Court of Appeals has explained that the determination of "materiality" on summary judgment presents a special problem. *Everts v. Holtmann,* 64 Or.App. 145, 151, 667 P.2d 1028 (1983). In *Everts,* quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), the court stated:

> "In considering whether summary judgment on the issue is appropriate, we must bear in mind that the underlying objective facts, which will often be free from dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact. Only if the established omissions are 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of ma-

---

**8.** Because both sides agree that the Trust 2 certificates are properly evaluated as notes, I will not separately analyze them as "investment contracts," except to say that I agree with the trust plaintiffs that the certificates appear to meet the factors set forth in *S.E.C. v. W.J. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as modified by the Oregon courts. The factors are: (1) an investment of money (or money's worth), (2) in a common enterprise, (3) with an expectation of profit, (4) to be made through the management and control of others. *Pratt v. Kross,* 276 Or. 483, 497, 555 P.2d 765 (1976); *see also Computer Concepts, Inc. v. Brandt,* 310 Or. 706, 713, 801 P.2d 800 (1990).

teriality appropriately resolved 'as a matter of law' by summary judgment." *Everts* 64 Or.App. at 150, 667 P.2d 1028 (additional citations omitted); *see also Loewen v. E.B. Galligan*, 130 Or.App. 222, 242, 882 P.2d 104 (1994)("[m]ateriality is an objective question that can be answered as a matter of law only when reasonable persons could not differ about the importance of the misrepresentations or omissions").

The trust plaintiffs have failed to present evidence sufficient to establish, as a matter of law, the materiality of the alleged untruths and omissions. The trust plaintiffs themselves have been silent, that is, they have not submitted affidavits or declarations on this issue. Consequently, the court is unable to rule on the record that as a matter of law, the sale of the Trust 2 certificates violated ORS 59.115(1)(b). On this issue, trust plaintiffs' motion for summary judgment must be denied.

### D. *Control Person Liability*

Finally, trust plaintiffs ask the court to rule that Tucker is personally liable as a "control person" for their alleged losses under ORS 59.115(3), which provides:

Every person who directly or indirectly controls a seller liable under subsection (1) of this section, every * * * officer or director of such seller, every person occupying a similar status or performing similar functions, and every person who participates or materially aids in the sale is also liable jointly and severally with and to the same extent as the seller, unless the nonseller sustains the burden of proof that the nonseller did not know, and, in the exercise of reasonable care, could not have known, of the existence of facts on which the liability is based. Any person held liable under this section shall be entitled to contribution from those jointly and severally liable with that person.

■ Tucker responds that he was not the issuer or seller of the Trust 2 certificates, and concludes that he cannot be held liable as a control person. The evidence, however, belies his argument. Tucker was Chairman and CEO of FFAC, facts that he admits. Affidavit of Richard J. Tucker ("Tucker Aff."), ¶ 2. FFAC, in turn, was the sole shareholder of and therefore controlled the seller of the securities, FFAC Auto Receivables Corporation. *See* Plaintiffs' Statement, Exhibit 1, p. 1 (which describes FFAC as "the sole stockholder of Seller"). Moreover, in his affidavit, Tucker admits that he "was directly involved with the creation of the Certificate structure," and states that "[i]t was [his] intent that the Certificate transactions were to be governed" by law other than Oregon securities law. Tucker Aff., ¶¶ 3, 11. This evidence supports, rather than negates, a finding that Tucker sufficiently controlled the seller or otherwise participated or aided in the sale of the Trust 2 certificates to bear potential liability under ORS 59.115(3).

■ Nonetheless, two unresolved issues of fact prevent summary judgment on this issue. First, liability under ORS 59.115(3) only becomes an issue once a "seller [is found] liable under subsection (1)," something that has not yet occurred. Second, ORS 59.115(3) provides a defense to control person liability that the parties have failed to address in any respect. Consequently, summary judgment in favor of trust plaintiffs on this issue must be denied.

To summarize, trust plaintiffs' motion for summary judgment is granted in part and denied in part as follows: The court finds as a matter of law that the Trust 2 certificates are securities; the remainder of the motion is denied.

## II. *MOTION II: Loan Plaintiffs' Motion for Summary Judgment Against Simon and Plunkett*

The "loan plaintiffs"[9] seek summary judgment against defendants Simon and Plunkett on their claims for sale of unregistered securities (Claim 1), and sale of securities by means of an omission or misstatement of a material fact (Claim 2). Additionally, plaintiffs Dean Maddox and Toni Maddox Smith seek summary judgment on their breach of contract (Claim 3), against Simon only.

### A. *Facts Relevant to This Motion*

At all relevant times, Simon was President and a director of FFAC; Plunkett was a director. It appears that in April 1998, plaintiff Dennis Dunn[10] was elected to the FFAC board of directors.

Dunn's involvement in the events leading to the present litigation has yet to be explored in any detail in the various motions that have been filed. In affidavits filed earlier in this case, Dunn explained that he is a lawyer, and that during the relevant time period he was licensed with United Pacific Securities, Inc., and/or Magellan Securities, Inc., both of which are licensed broker/dealers. Declaration of Dennis L. Dunn (filed October 16, 2000)("Dunn Decl."), ¶ 3. According to Dunn, he "sold the FFAC Trust Certificate program to his clients," *i.e.*, the trust plaintiffs. Dunn Decl., ¶ 5. With respect to the loan portfolio at issue in the second motion, Dunn states that

> After the collapse of FFAC in April of 1998, I became a director of the company in an attempt to protect my clients. I organized a group of my clients who purchased some of FFAC's corporate assets to provide funds to allow FFAC to reorganize through Bankruptcy. After these purchases, we learned that another party, the Allen Family Trust, claimed a security interest in the car loans that we had purchased. This security interest had not been disclosed to my clients.

Dunn Decl., ¶ 12.

According to the affidavit Dunn filed in connection with the loan plaintiffs' motion for summary judgment, when FFAC collapsed in 1998, he "attempted to assist Mr. Simon in * * * restructuring the company, largely in an attempt to protect [his] investors who had also lost large sums of money." Affidavit of Dennis Dunn ("Dunn Aff."), ¶ 3. Simon "indicated that FFAC had a portfolio of assets that could be sold to secure the restructuring of the corporation." *Id.*

The "portfolio of assets" consisted of receivables due on vehicle financing loans. The loan sales by FFAC to Dunn and his clients are documented in two transactions. The first, to plaintiff Dean Maddox, is reflected in a "Confirmation and Assignment" dated April 13, 1998. Plunkett's Opposition to Plaintiffs' Motion for Summary Judgment ("Plunkett Response"), Exhibit 106. According to Schedule A attached to that document, the transaction involved loans with a total principal balance of $250,126.91 as of March 31, 1998, Plunkett Response, Exhibit 106, p. 3.

---

**9.** The "loan plaintiffs" are plaintiffs who purchased shares in a loan portfolio and include Burr and Jean Battig, W.H. and Rita Bulmer, Lyle and Sherlee Cave, Gertrude Cook, Keith and Sherry Dahle, Earl and Mary Edmonds, Hillar Hanson, Glare and Margery Hoffman, Penny Linwood, Dean Maddox, Toni Maddox Smith, Leland Ramos, Calvin and Joyce Rose, Doug Schmidt, Ronald and Mildred Schmidt, Leonard and Nancy Schultz, Shirley Tripp, and Russell and Aleen Wilson. For reasons not apparent on the present record, plaintiff Dennis Dunn has not included himself among the moving plaintiffs on either motion.

**10.** *See* footnote 9.

The second sale was to Dunn, and is documented in another "Confirmation and Assignment" dated May 28, 1998. Plunkett Response, Exhibit 101. The second transaction involved loans totaling $233,725.99. *Id.* at p. 2.

According to Dunn, the FFAC offered the loans at approximately 50 percent of their face values, "to compensate my investors for the heavy default risk of high interest loans." Dunn Aff., ¶ 6. The Maddox Confirmation and Assignment Agreement also contains an agreement by FFAC to repurchase the loan portfolio "within one year for 110% of the amount paid by the Purchaser * * * allowing a return of 15% interest * * * in addition to the 10% premium being paid for the repurchase." Plunkett Response, Exhibit 106, p. 2. Dunn's Confirmation and Assignment contains no similar language. *See* Plunkett Response, Exhibit 101.

Also according to Dunn, the loan plaintiffs invested a total of $362,000 in the loan portfolios. The loan plaintiffs paid for their investments either through Dunn or by funds sent directly to FFAC.[11] Dunn "operated as trustee for the investors" and in that role:

> received funds from the American Loan Finance Corp. ("ALFI") for the benefit of investors, had the funds deposited into a separate account, had an accounting done as to what portion of the funds was to be paid to each investor, and sent the amount to either the investor or to investment accounts that they owned.

Supplemental Affidavit of Dennis Dunn, ¶ 4. In May 1998, to save on management fees, Dunn and Maddox decided to add the Maddox loan portfolio to the other portfolio(s) with Dunn acting as trustee. Supplemental Affidavit of Dennis Dunn, ¶ 5.

Since 1993, the Allan Family Trust ("Allen") has held a first security interest in the FFAC loans. *See* Second Amended Complaint, Exhibit 8 (UCC–1). In 1994, Allen subordinated "its security interest" to Margaret Lombardo, a trustee for the Trust 2 certificates. *See* Affidavit of James Simon ("Simon Aff."), Exhibit 104. At some point, Lombardo filed a financing statement in Texas also covering the FFAC loans.[12] In April 1998, Allen gave notice to FFAC that it was in default on various obligations totaling $725,000, and demanded that FFAC remit all moneys due to it directly to Allen. Plunkett Response, Exhibit 107.

Loan plaintiffs who have filed affidavits and Dunn deny that Plunkett or Simon disclosed Allen's security interest to them before sale of the loan portfolios. *See, e.g.,* Dunn Aff., ¶ 8; Affidavit of Shirley Tripp, ¶ 4; Affidavit of Sherlee Cave, ¶ 3; Affidavit of W.H. Bulmer, ¶ 4. Dunn claims that he first learned of Allen's lien when Allen took steps to foreclose the security interest. Dunn Aff., ¶ 8. In contrast, both Plunkett and Simon state in their affidavits that they discussed the Allen security interest and subordination with Dunn at the time of the loan portfolio sales. Simon Aff., ¶ 4; Affidavit of Patti Plunkett, ¶ 4.

**B. *Was the FFAC Loan Portfolio a "Security" Under Oregon Law?***

■ Loan plaintiffs contend that the loan portfolio is a security in the form of

---

11. Plunkett and Simon both state in their responses that the loan plaintiffs did not purchase any loan portfolio from FFAC and that Dennis Dunn was the sole purchaser, *see* Plunkett Response, p. 1, and Simon Response, p. 1, but the evidence suggests otherwise. *See, e.g.,* Plaintiffs' Reply Memorandum, Exhibit 11 (copies of checks written to FFAC).

12. The relative lien positions of the two secured parties was or is the subject of litigation in the Superior Court of the State of California, County of Orange, entitled *Robert M. Allan v. Dennis Dunn, et al,* Case No. 797077. *See* Plunkett Response, Exhibits 107 and 108. The details of that litigation are unknown to the court on the present record.

an "investment contract." [13] *See* ORS 59.015(19)(a). As discussed earlier in this opinion, in determining whether an instrument is an investment contract, Oregon applies the definition outlined in *Securities and Exchange Commission v. Howey, supra,* 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), as modified by the Oregon courts. The relevant factors are: (1) an investment of money (or money's worth), (2) in a common enterprise, (3) with an expectation of profit, (4) to be made through the management and control of others. *Pratt v. Kross,* 276 Or. 483, 497, 555 P.2d 765 (1976); *see also Computer Concepts, Inc. v. Brandt,* 310 Or. 706, 713, 801 P.2d 800 (1990).

Simon and Plunkett do not address the *Howey* factors in their arguments; instead, they merely state that the loan portfolio was an asset subject to a UCC–1 financing statement. That response, however, ignores the breadth of the definition of "security," and is not helpful to the court.

Measuring the evidence against the factors, it is without dispute that the first factor—an investment of money—is met. ▮The second factor, "common enterprise," requires a showing of either an enterprise common to an investor and the seller, promoter, or some third party (vertical commonality), or an enterprise common to a group of investors (horizontal commonality). *Reynolds, supra,* 952 F.2d at 1130; *see Jost v. Locke, supra,* 65 Or. App. at 711–12, 673 P.2d 545 (" 'common enterprise' element [means] a scheme in which the 'fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking those investments or of third parties' ") (*quoting*

*Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc.,* 474 F.2d 476, 482 n. 7 (9th Cir.1973)).

▮Based on the record presently before the court, it appears that horizontal commonality, that is, "the pooling of interests combined with the pro-rata sharing of profits," is present. *See Jost,* 65 Or.App. at 712, 673 P.2d 545 (*citing Turner, supra* ). That commonality is sufficient to meet the "common enterprise" element of the *Howey* test. *Reynolds,* 952 F.2d at 1131.

With respect to the last two factors, "expectation of profit" "to be made through the management and control of others," the evidence of record shows that the loan plaintiffs purchased their shares of the loan portfolio at a discount and, presumably, expected to make a profit upon payment of the loans. Further, it is undisputed that the loan plaintiffs [14] were not employed by or involved in the management of FFAC or its loan servicer, ALFI. In this sense, the loan plaintiffs meet the description of "investor" set forth in the trial court decision in *Securities & Exchange Com'n v. Glenn W. Turner Ent., Inc.,* 348 F.Supp. 766 (D.Or.1972), *aff'd,* 474 F.2d 476 (9th Cir.1973):

The most essential consistency in the cases which have considered the meaning of "investment contract" is the emphasis on whether or not the investor has substantial power to affect the success of the enterprise. * * * When he is relatively uninformed and unskilled and then turns over his money to others, essentially depending upon their representations and their honesty and skill in

---

**13.** Loan plaintiffs also assert that the loan portfolio is an "evidence of indebtedness" under ORS 59.015(19)(a), but do not separately discuss that theory.

**14.** Again, Dunn is not among the group defined, for purposes of the present motion, as "loan plaintiffs."

managing it, the transaction is an investment contract.

348 F.Supp. at 775 (Skopil, J.).

In the absence of any compelling or even persuasive evidence or argument to the contrary, I find that as to the loan plaintiffs, the loan portfolio was a security. Simon and Plunkett do not contend that the portfolio was registered as a security or that it was exempt from registration, consequently I also find that the sale of the security in Oregon violated ORS 59.055(1).

### C. *Control Person Liability*

 Loan plaintiffs next contend that Simon and Plunkett should be held personally liable as "control persons" under ORS 59.115(3). In view of their positions as officers and directors of FFAC, I agree with loan plaintiffs that Simon and Plunkett both are control persons subject to potential personal liability. As explained above in connection with the trust plaintiffs' motion, however, control person liability under ORS 59.115(3) becomes an issue only upon a finding that there has been a violation of ORS 59.115(1)(b), *i.e.*, that a person has sold a security by means of an untrue statement or an omission to state a material fact. Because on the present record there is a disputed issue of fact concerning the extent of Dunn's [15] knowledge of Allen's lien position when he encouraged the loan plaintiffs to invest, summary judgment on the issue of control person liability would be premature and must be denied.

### D. *Breach of Contract Claim Against Simon*

Dean Maddox and Toni Maddox Smith seek summary judgment against Simon based on the following language in the Maddox "Confirmation and Assignment":

The following parties agree to be personally responsible if the representations contained in the Representations of Seller are inaccurate in any material way.

Plunkett Affidavit, Exhibit 106. The "Representations of Seller," in turn, include the following:

Representations of the Seller: The following representations are made related to all of the loans in Schedule A:

\* \* \* \* \* \*

3. [FFAC] is the legal owner of all loans listed on Schedule A of the Confirmation and Assignment and has first priority on the security.

4. The loans are being held and processed by American Lenders Financial Services and [will be] separate from FFAC and are bankruptcy remote related to FFAC.

*Id.*

The short answer to this portion of loan plaintiffs' motion is that the evidence of record is incomplete, confusing, and, consequently, insufficient to permit a ruling on this overwhelmingly fact-bound matter as "a matter of law." Fed.R.Civ.P. 56. It may well be that as a factual matter, FFAC did not have "first priority on the security" or that the loans were not "separate from FFAC," as plaintiffs contend, but those facts may not be "material," depending on what these plaintiffs knew or did not know at the time of the transaction. Moreover, it is not clear what, precisely, Simon was undertaking to do, if anything, as his "personal responsibility." Consequently, this portion of loan plaintiffs' motion must be denied.

---

**15.** Dunn appears to have been acting as the loan plaintiffs' agent and his knowledge, if any, may potentially be imputed to them.

To summarize, loan plaintiffs' motion for summary judgment is granted in part and denied in part as follows: The court finds as a matter of law that sale of the loan portfolio to the defined group of loan plaintiffs was the sale of an unregistered security; the remainder of the motion is denied.

## CONCLUSION

Trust plaintiffs' motion for summary judgment against defendant Tucker (# 45), and loan plaintiffs' motion for summary judgment against defendants Simon and Plunkett (# 55) are granted in part and denied in part as set forth in this opinion.